DOMINIC PORETTA
*vs.*
SUPERIOR DOWEL COMPANY

Oxford.   Opinion, December 20, 1957.

*Gerry Brooks,* for plaintiff.

*George W. Weeks,* for defendant.

Sitting: Williamson, C. J., Webber, Beliveau, Tapley, Sullivan, Dubord, JJ.

Dubord, J. This case is before us on exceptions of the defendant to the acceptance of a referee's report. The action is one of assumpsit to recover the amount of $2,574.44 for wood delivered by the plaintiff to R. H. Young & Son, Inc., it being the contention of the plaintiff that the defendant was the undisclosed principal of R. H. Young & Son, Inc. The case was heard under rule of reference with right of exceptions reserved in matters of law. The referee found for the plaintiff and assessed damages for the total amount claimed. Over the written objections of the defendant, the report of the referee was accepted and exceptions taken.

For the purposes of convenience the defendant will be hereinafter referred to as Superior and R. H. Young & Son, Inc., as Company.

The defendant, by its objections contends that the evidence, as a matter of law, did not warrant the award against it. Upon this issue, the burden is on the defendant. *Wood* v. *Balzano*, 137 Me. 87, 15 A. (2nd) 188, *Hovey* v. *Bell*, 112 Me. 192, 91 A. 844.

No issue is raised about the findings of fact and defendant relies solely upon his contention that erroneous conclusions were reached by the referee from the evidence in the case.

Superior contends first, there was no agency; second, if there was an agency, the purchase of the wood by the Company was not within the scope of its authority; and third, that payment by Superior to the Company for the wood which forms the basis of the suit, absolves Superior from liability in this action.

The Company was in the business of manufacturing dowels at Bethel, Maine. It appears from the evidence that

Superior was in the dowel business and that about two years prior to January 11, 1954, one of its suppliers suffered a disastrous fire and Superior contacted the Company for the purpose of having the Company manufacture dowels for Superior. The production of the Company being inadequate, Superior advanced substantial sums of money to the Company, so that its manufacturing facilities could be enlarged. For these advancements the Company gave security to Superior.

Prior to January 11, 1954, it appears that the Company and Superior operated purely on an oral basis. On that date Superior and the Company, in a desire to put into writing the business procedure which had existed between them, and to modify and supplement the same, entered into a long and complex written agreement, setting forth the nature of their prior transactions. A short time later this agreement was modified by another long and equally complex writing.

In the preamble to the agreement executed January 11, 1954, is to be found the following provision:

> "Since Young was unable to expend large amounts for the purchase of lumber, Superior Dowel agreed to finance the purchase by Young of the lumber required to fill Superior Dowel's orders for wooden dowels, with Young to purchase the said lumber in its own name and as its property and with Superior Dowel to advance $30.00 per cord to Young for lumber so purchased."

If this statement is to be construed as meaning that prior to January 11, 1954, the lumber purchased by the Company was to be the property of the Company with the only duty on the part of Superior to advance the amount of $30.00 per cord to the Company for the lumber purchased, it appears that this portion of the oral procedure was changed by the fourth paragraph of the agreement, which sets forth the method of making purchases of lumber, and the steps to be

followed thereafter. Paragraph four, among other provisions, contains the following, viz.:

"FOURTH: In connection with all purchases of lumber hereafter made by Young for the manufacture of wooden dowels for Superior Dowel.

"(a) All such purchases are to be made by Young as agent for Superior Dowel, and with funds transmitted to it by Superior Dowel;

"(b) All such lumber thus purchased is to be considered, at all times, the property of Superior Dowel, and is to be so listed on Young's books and records;

"(c) In connection with each such purchase, Young is to send to Superior Dowel a letter signed by it, in the form annexed hereto and made a part hereof as Exhibit '2';

"(d) Young is to keep said lumber on its premises, separate and apart from lumber belonging to Young or anyone else until processed into finished dowels."

The next paragraph provides that signs satisfactory to Superior, bearing the legend "Property of Superior Dowel Company," indicating ownership of the lumber in Superior, are to be placed upon the wood.

Another paragraph reads as follows:

"Young shall not, in any event, purchase lumber as the agent of, or on behalf of, Superior Dowel without receiving the express authority of Superior Dowel therefor, in writing before such purchase, and Young shall not be able to require Superior Dowel to loan it money to pay for lumber purchased in its own name unless it receives the express authority of Superior Dowel therefor, in writing, it being the intention of Superior Dowel and Young that Superior Dowel shall not be obligated or required to provide the funds for the purchase of any lumber by Young (as agent of

Superior Dowel, or otherwise) or to pay for said lumber unless such purchase is expressly authorized in writing by Superior Dowel before the purchase."

Exhibit #2 referred to in subparagraph (c) of the Fourth Paragraph, *supra*, reads as follows:

"(Date)

"Superior Dowel Co.
438 Washington Street
New York 13, New York

Gentlemen:

This is to advise you that we have this day purchased, as your agent, .......... cords of wood.

This wood is to be held in our yard (separate and apart from any wood belonging to us or to anyone else) until processed into finished dowels. The finished dowels are to be stored by us until shipping instructions are received from you.

This wood, and the finished dowels to be manufactured therefrom, are, of course, your property, and will be so listed on our books. While the wood is held in our yard, and while finished dowels are stored by us, they are to be marked 'Property of Superior Dowel Co.'

No charge for holding the wood, or storing the finished dowels, will be made to you.

Very truly yours,

R. H. YOUNG & SON, INC.
By"

The agreement specifies the price to be paid by Superior to the Company for the dowels manufactured by the Company and delivered to Superior. The agreement also provides for the method of payment for these dowels by Superior to the Company; and gives Superior authority, as soon as it receives bills from the Company covering storage and shipment of wooden dowels made pursuant to orders placed by Superior, to deduct and retain 40% of

said bills, said 40% to be first applied to the total of purchase price of lumber and loan or advances, and the balance to be applied to other indebtedness from the Company to Superior.

Between February 22, 1954, and April 1, 1954, the plaintiff delivered to the Company the wood which forms the basis of this action. The price of this wood was $34.00 and $36.00 per cord. The evidence discloses that, although the wood delivered by the plaintiff to the Company was not segregated by the Company in accordance with provisions of the agreement, that Superior received all of the wood in the form of dowels delivered to Superior or dowels placed in the Company's warehouse subject to Superior's orders. The finding of the referee in this respect is supported by the evidence.

The referee found that the wood had been delivered to the Company before the Company sent an invoice therefor to Superior. It also appears that no written authority relating to this order was given by Superior to the Company. The evidence further indicates that upon receipt of the invoice by Superior, the latter advanced the sum of $30.00 per cord to the Company. At this point it is significant to note, that the amount advanced did not cover the full price of the wood.

The first issue for determination is whether or not an agency relationship actually existed between Superior and the Company.

To determine this question, as was well stated by the referee, in his decision, not only must we take into consideration the contract itself, but also the course of dealings between the parties whether within or outside the contract.

We have already referred to the fourth paragraph of the agreement which provides that "all such purchases are to be made by Young as agent for Superior Dowel;" and "all

such lumber thus purchased is to be considered at all times, the property of Superior Dowel and is to be so listed on Young's books and records."

The agreement also specified that the Company was to conspicuously display upon its premises, at such place or places as the lumber was kept and stored, signs satisfactory to Superior, bearing the legend "Property of Superior Dowel Co.;" and while it appears that this portion of the contract was not followed by the Company, the evidence indicates that the manufactured dowels were properly marked by the Company as the property of Superior in accordance with another provision of the contract.

The statements contained in the form letter, introduced as Exhibit 2, also supports the finding that an agency relationship was contemplated by Superior.

There is evidence in the case to the effect that in 1954 all dowels manufactured by the Company were sold to Superior; that orders from Superior came "in blanket orders"; that the Company was in touch with Superior weekly; that orders would come in from Superior almost daily; that officers of Superior visited the Company's mill frequently.

The modified agreement, previously referred to, contains a provision that during the one-year period from January 11, 1954, to January 11, 1955, Superior would place with the Company, and the Company would accept and fill, orders for wooden dowels in the aggregate amount of $75,000.00; and immediately after this provision is found the following clause:

> "With each order - - - - Superior Dowel is to agree to allow Young to purchase the lumber, required to fill said order *as its agent* (emphasis supplied) and Superior Dowel is to agree to pay for said lumber so purchased."

The theory that the Company was acting as agent for Superior finds added strength, we believe, in another provision of the contract wherein the Company agreed:

> "Not to sell, give away or deliver any wooden dowels to, or manufacture any wooden dowels for, any person, firm, association or corporation other than Superior Dowel, unless otherwise authorized in writing by Superior Dowel."

We regard the following testimony of the President of Superior as having great significance:

> "Q   Bearing in mind the provision in the contract regarding agent, did you and Mr. Young, Sr. and Dick have an agreement regarding that provision?
> "A   No.   We had absolutely no agreement so far as that goes.   That was put in for the purpose of protecting me against seizure by any other cutters after what I had paid for.
>
> "Q   The contract calls for sending orders for them to purchase wood.
> "A   It was never followed through.
>
> "Q   That was ignored by both sides?
> "A   Yes.
>
> "Q   Do you know the reason for that?
> "A   Frankly, we never really held to the agreement at all.   It was just merely as protection and security we put it on paper."

It is clear that Superior entered into an agreement whereby the Company would purchase wood in the capacity of agent for Superior for the purpose of enabling Superior to claim ownership of the wood and the dowels manufactured therefrom.

At this point, we are induced to enter the field of supposition. Supposing that after the Company had purchased the wood from the plaintiff, the price of wood had gone up.

Without doubt Superior would have obtained and claimed the benefit of the increased value. Supposing the Company had gone out of business and the wood purchased from the plaintiff had remained in its possession. Surely, under the terms of the agreement between Superior and the Company, Superior would have laid claim to the wood. Going one step further, supposing a creditor of the Company had sued the Company and attached the wood in question. Without doubt, Superior would have promptly entered the claim that the wood belonged to it. The position now taken by Superior would be to retain the benefits of the contract, but disavow its liabilities.

It is our opinion there was ample evidence to support the finding on the part of the referee, that an agency relationship existed.

In the course of argument of counsel for the defendant, the contention was advanced that the report should be recommitted because the referee did not pass upon the issue of the abandonment of the contract. There is no written objection to the acceptance of the report setting forth this contention.

The case of *Blanchette* v. *Miles*, 139 Me. 70, 27 A. (2nd) 396 is authority to the effect that a referee under Rule XLII is not required to make special findings of fact and that the failure to do so does not constitute exceptionable error. A distinction was noted between cases where the referee did not pass on "material matters in issue," as was the situation in *Kennebec Housing Co.* v. *Barton*, 122 Me. 374, 377, 120 A. 56, 57.

It is our opinion that if Superior and the Company disregarded any portion of their written agreement, those portions of the agreement which created the agency relationship and established title in the wood and the dowels manufactured therefrom in Superior, were not abandoned. The contention advanced by Superior upon the claim of aban-

donment is not addressed to a material issue. The point is not raised in the written objections as was done in *Kennebec Housing Company* v. *Barton, supra;* and, in any event, the report of the referee indicates that he gave consideration to this phase of the case in arriving at his decision.

We pass now to the second contention of the defendant, that if there was an agency relationship, the purchase by the Company of lumber from the plaintiff was not within the scope of its authority.

The evidence indicates, and the referee so found, that when the invoice for the wood in question was delivered by the Company to Superior, the wood had already been purchased. Superior had knowledge of the weak financial status of the Company and is chargeable with the knowledge that the wood was purchased by the Company on credit. It is our opinion that any deviations from the provisions of the contract relating to the purchase of wood by the Company were waived by Superior; and that Superior, impliedly, at least, authorized the purchase of the wood by the Company on the credit of Superior.

Bearing in mind the course of dealings between Superior and the Company, we are of the opinion that the evidence supports a finding that the purchase of the wood from the plaintiff by the Company was within the scope of its authority as agent for Superior.

Having determined that the wood was purchased by the Company in the capacity as agent for Superior, and having further determined that the actions of the Company were within the scope of its authority, we pass now to the question of liability.

> "It is competent to show that contracting parties were agents of other persons, so as to give the benefit of the contract to, or charge its liabilities upon, the unnamed principal. An undisclosed principal may be shown to be the real party in a trans-

action in which the agent is the only ostensible person." *Putnam* v. *White,* 76 Me. 551, 554.

"The rule is well settled that either the agent or an undisclosed principal is liable at the election of a creditor or a person to whom the agent has incurred liability acting within the scope of his authority." *Libby* v. *Long,* 127 Me. 293, 296, 143 A. 66.

"It is unquestionably the general rule of our law that an undisclosed principal, when subsequently discovered, may, at the election of the other party, if exercised within a reasonable time, be held upon all simple non-negotiable contracts made in his behalf by his duly authorized agent, although the contract was originally made with the agent in entire ignorance of the principal." 2 Mechem on Agency, 2nd Ed., § 1731; 1 Williston on Contracts, Rev. Ed. § 286; 3 C. J. S., Agency § 244; 2 Am. Jur., Agency, § 393; 1 Am. Law Inst., Restatement of Agency, § 186; *Manchester Supply Co.,* v. *Dearborn, et al.,* 10 A. (2nd) 658 (N. H.)

"From the authorities cited above, as well as from the very nature of the situation, this right of action does not depend upon the third person's knowledge, when dealing with the agent, that the latter was acting for another instead of for himself. Obviously everyone, when dealing with an agent for a wholly undisclosed principal, believes that he is dealing with the agent only, relies solely upon the agent individually, and, if credit be extended, extends that credit to no one but the agent. However, and herein lies the anomaly, the creditor has a right of action against the undisclosed principal, when discovered, even though he never learned of the existence of the latter until after the bargain was completed, if he can prove, as in every other case of agency, that the agent's acts were within the scope of authority." *Manchester Supply Co.* v. *Dearborn, et al., supra.*

The defendant contends vigorously that even though there was an agency relationship, and even though the agent acted

within the scope of its authority, that payment by Superior to the Company for the wood absolves Superior from liability.

The issue thus raised presents a problem of novel impression in this State. The issue is:

> "Is an undisclosed principal absolved from liability to his agent's vendor who has sold goods to the agent upon the credit of the agent who has received payment or advances, or a settlement of accounts, from his undisclosed principal before discovery of the undisclosed principal by the agent's vendor.?"

There are two different rules bearing upon the issue. The first one, which appears to be supported by the weight of authority is that an undisclosed principal is generally relieved of his liability for his agent's contracts to the extent that he has settled with his agent prior to the discovery of the agency. The other rule is, that an undisclosed principal is discharged only where he has been induced to settle with the agent by conduct on the part of the third person leading him to believe that such person has settled with the agent.

The decisions appear to be in a state of hopeless confusion.

> "The rule that an undisclosed principal, when discovered, may be held liable upon a contract made in his behalf will not be enforced for the advantage of a third party, if it will work injustice to the principal. An undisclosed principal may be relieved from liability by reason of a changed state of accounts between him and the agent, the rule formerly laid down in England and now very generally followed in the United States being that, where the principal, acting in good faith, has settled with the agent so that he would be subjected to loss were he compelled to pay the third person, he is relieved from liability to the latter, and this

doctrine is, in at least one jurisdiction, in effect prescribed by statute. This doctrine is now held in England, and in a few cases in the United States, to be too broad, and the better rule is stated to be that the principal is discharged only where he has been induced to settle with the agent by conduct on the part of the third person leading him to believe that such person has settled with the agent or has elected to hold the latter. In any event the principal is relieved from liability, where he has been induced by the conduct of the third person to settle with the agent." 2 C. J., Agency § 531; 3 C. J. S., Agency § 249.

"It is often said that persons dealing in their own names are presumed to deal for themselves as principals, yet if one authorized by another to act as his agent, in acting on behalf of the principal, fails to disclose the principal to the third person, or to disclose that he is acting as agent, the principal, when discovered, may become liable for the acts done in his behalf, and may be sued thereon just as if, at the time the transaction was entered into, the agent had disclosed the fact of his agency and the identity of the principal, unless the principal and the agent have so adjusted their accounts that to hold the principal liable would work an injustice to him." 2 Am. Jur., Agency, § 393.

The expression "unless the principal and the agent have so adjusted their accounts that to hold the principal liable would work an injustice to him," is qualified by 2 Am. Jur. § 399, which reads as follows:

"The general rule which allows a third person to have recourse against an undisclosed principal is subject to the qualification that the principal shall not be prejudiced by being made personally liable because he has in good faith relied upon the conduct of the third person and has paid or settled with the agent; conversely, the rule is that a third person who deals with the agent of an undisclosed principal can, upon discovering the principal, resort to the latter for payment, unless by his con-

duct he has led the principal in the meanwhile to pay or settle with the agent. The comparable expression of the American Law Institute is that an undisclosed principal is discharged from liability to the other party to the contract if he has paid or settled accounts with his agent, reasonably relying upon conduct of the other party, not induced by the agent's misrepresentations, which indicates that the agent has paid or otherwise settled the accounts. Thus, if the principal has settled with his agent on the basis of receipts or other documents furnished the agent by the seller, the principal cannot be held liable for the price."

The American Law Institute, as of May 4, 1933, adopted and promulgated the following rule:

"An undisclosed principal is discharged from liability to the other party to the contract if he has paid or settled accounts with an agent reasonably relying upon conduct of the other party, not induced by the agent's misrepresentations, which indicates that the agent has paid or otherwise settled the account." 1 Am. Law Inst. Restatement of Agency, § 208.

It would seem, by inference, at least, that Massachusetts would follow the first rule. The case of *Emerson* v. *Patch,* 123 Mass. 541, has been cited in support of this doctrine. However, the issue was not actually determined in that case. Briefly, the facts in this case were that Emerson sold wood to the agent of an undisclosed principal. Before the agency was discovered the principal settled his accounts with the agent. The court implied that such settlement would be a defense, but ruled that question could arise only when it was ascertained as a fact that such a payment had actually been made, and in good faith. The exceptions in that case were sustained, but upon another ground.

In the New York case of *Fradley* v. *Hyland,* 37 Fed. Rep. 49; 2 L. R. A. 749, the following principle was laid down:

> "Where an agent, authorized by a principal to purchase supplies for the use of the principal, and instructed to purchase only for cash, purchases in his own name, upon credit, of a seller who supposes the agent to be buying for himself only, and the principal pays or settles with the agent for the supplies in good faith, supposing that the agent had purchased them for cash or upon his personal credit, he is not liable over again to the seller for the price of the supplies."

It is to be noted that this opinion assumes that the agent had violated his instructions, and was not authorized to purchase upon credit.

This case of *Fradley* v. *Hyland, supra,* has been cited frequently as authority in support of the first rule. However, there is also found in this case the following statement:

> "The rule that a seller who deals with the agent of an undisclosed principal can, upon discovering the principal, resort to the latter for payment, *unless by his conduct he has led the principal in the meanwhile to pay or settle with the agent,* (emphasis supplied) does not apply to a case in which the agent bought contrary to his instructions, and the seller gave credit to the agent supposing him to be the only principal, and the principal has in the meantime paid the agent."

This last statement appears to be inconsistent with the first one, and it is to be noted that the second statement includes a portion of the so-called second rule. Consequently, the reasoning in this opinion is not too clear, and is of little assistance in dissipating the existing perplexities, although it would seem from other quotations in the case that the court sustained the first rule, to the effect that where a purchase has been made by an agent upon credit authorized by the principal, but without disclosing his name, and payment is subsequently made by the principal

to the agent in good faith before the agency is disclosed to the seller that the principal would not be liable.

See also *Montague Mailing Machinery Co.* v. *All-Package Grocery Stores Co., Inc., et al.*, 169 N. Y. S. 920, which is to the effect that an undisclosed principal is liable to a third party, who dealt in good faith with an agent for an undisclosed principal, with the qualification, however, that nothing had in the meantime passed between the principal and its agent to alter the state of their account, such, for example, as payment by the principal to the agent prior to any claim made against the principal by the vendor.

In *Southern Ry. Co.* v. *Simpkins Co.*, 100 S. E. 418 (N. C.), 10 A. L. R. 731, the court followed the rule that:

"Where one dealing with an agent with knowledge of his agency gave credit exclusively to the agent, he cannot thereafter recover from the principal who has in good faith settled with the agent."

This case as well as the decision in the *Fradley* v. *Hyland* case discusses at some length the history of the varying decisions upon the issue.

In arriving at his decision, in the instant case, the referee first found that there was no evidence of conduct on the part of the plaintiff which led the defendant to pay the agent. This finding of fact is supported by the evidence. The referee, then applied the rule laid down in the Restatement of the Law and found for the plaintiff.

The defendant contends that the referee applied erroneous law, in arriving at his decision, and that he should have ruled that payment by Superior to the Company absolves Superior to the extent of the amount of the payment by Superior to the Company.

We are, therefore, called upon to determine which rule shall become the law in this State.

Manifestly, if we adopt the rule which we have designated as the first rule, as distinguished from the rule laid down in the Restatement of the Law of Agency, then, as the payment made by Superior to the Company is in excess of the amount remaining due to the plaintiff, the exceptions of Superior would have to be sustained. On the other hand, if we adopt the rule laid down in the Restatement, then the decision of the referee was correct and Superior's exceptions should be overruled.

We cite § 292, 1 Williston on Contracts, Rev. Ed.:

"There is considerable confusion of authority in regard to the question whether settlement by the principal with his agent before the person with whom the agent dealt makes a claim upon the principal is a defense to the latter. The decision of the controversy depends upon whether the liability of an undisclosed principal is to be regarded as an absolute right of one who deals with the agent although confessedly the credit of the agent has been exclusively relied upon, or whether, on the other hand, a person who thus deals with an agent is to be given only such limited right against the undisclosed principal as is consistent with equity. If the first of these theories is sound, the person dealing with the agent cannot be deprived of his right against the principal unless in some way he has subjected himself to an estoppel by misleading the principal. If, however, the second theory is sound, the mere fact that the principal has innocently put himself in a situation where hardship will be caused by holding him liable on the agent's contract should be a defense. The English court has wavered somewhat uncertainly between these two views. The earliest decision on the subject adopted the second theory and held that recovery from the principal was 'subject, however, to this qualification, that the state of the account between the principal and the agent is not altered to the prejudice of the principal.' This rule is supported perhaps by the weight of author-

ity in the United States, but has now been much modified in England, the first of the two theories suggested above having been adopted by a later decision in the middle of the last century, and the principal held liable unless the plaintiff in some way had misled the principal.

"It is still the law of England that if the plaintiff was aware when the contract was made that the agent was acting for some principal, though unnamed, a settlement by the principal with his agent will not preclude a suit against the principal by the third party; but if the settlement by the undisclosed principal was made when the third party was still unaware that the agent was not himself the principal, it has been held that the plaintiff cannot hold the principal. The later English cases find support in a few decisions in the United States. There seems little ground for the fine distinctions taken by the later English cases. It would be better to adopt squarely either the rule that the undisclosed principal is liable in every case unless the plaintiff has discharged him by electing so to do, or by misleading him to his injury; or, on the other hand, to hold that the principal is not liable whenever his action honestly taken makes it undue hardship to hold him. The Restatement of Agency has adopted the former view not only in the case of the undisclosed principal, but also with respect to disclosed and partially disclosed principals."

The development of this phase of the law in the English cases is of interest. The first case which laid down the rule that an undisclosed principal is not liable to the vendor if the principal has paid or settled accounts with the agent, was that of *Thompson* v. *Davenport,* 9 Barn. & Cress. 78, decided in 1829.

The rule set forth in this decision has been known as Lord Tenterden's rule.

The next case was that of *Heald* v. *Kenworthy,* 10 Exch. 739, decided in 1855. In this case Parke, B. ruled that Lord

Tenterden's rule was mere dictum and his decision was to the effect that the undisclosed principal has no defense when he has settled accounts or made payment to the agent, unless the third party has misled the principal into making such payment. This was the first expression of the law now promulgated in the Restatement of the Law of Agency.

Next came the case of *Armstrong* v. *Stokes*, 7 Q. B. 598, decided in 1872. In this case it was held that the rule of Parke, B. was too narrow and the court followed Lord Tenterden's rule.

Then came the case of *Irvine* v. *Watson*, 5 Q. B. Div. 102, decided in 1879, in which the court followed the Lord Tenterden rule and refused to follow the rule of Parke, B. However, upon appeal, the appellate court declared the rule as laid down by Parke, B. as the true one.

It would appear, therefore, that the latest rule in England was laid down in the appeal of *Irvine* v. *Watson,* to the effect that the rule of Parke, B., that is, the present Restatement rule, is the correct one.

In the case of *Irvine* v. *Watson,* the court did not expressly overrule *Armstrong* v. *Stokes,* and spoke of it as "a very remarkable case," the decision of which depended upon "the peculiar customs obtaining in Manchester in relation to the business of commission merchants."

The rule as laid down by Lord Tenterden was approved by Judge Story in his Commentaries on the Law of Agency, and we quote § 449, Story on Agency:

"The liability of the principal to third persons, where the purchase is made in the name of his agent, and the principal is not known or disclosed at the time, is qualified by another consideration; and that is, that the principal will not be made personally liable, if, in the intermediate time, he has settled with his agent, without any suspicion of his own personal liability, or if he would other-

wise, without any default on his own part, be prejudiced by being made personally liable. Therefore, if, in the intermediate time, the principal has paid the agent for goods purchased in the name of the latter, or if the state of the accounts between the agent and the principal would make it unjust, that the principal should be held liable to the vendor, such fact of payment, or such a state of accounts, would be a good defence to a suit brought by the vendor against the principal. The same result would arise, if the vendor had accepted a negotiable security from the agent, for the amount, payable at a future day, or had given him a receipt, by which he had in the meantime settled with his principal, or the latter had been induced to deal differently with the agent, from what he would otherwise have done. So, if the vendor had suffered the day of payment for the goods to pass by, without demanding payment, and had thereby induced the principal to suppose, that credit was exclusively given to the agent, and upon the faith of that he had paid over the amount to the agent, or settled it in account with him, the principal would be discharged."

In support of the rule, Judge Story cites the decision in *Thomas* v. *Davenport, supra,* which as has already been pointed out was decided in 1829, and which is no longer the law as decided in the appeal case of *Irvine* v. *Watson, supra.*

Moreover, it is interesting to note that the examples mentioned in § 449 of Story on Agency, are in reality exceptions contemplated by the present statement of the law in the Restatement of the Law of Agency; all of which adds to the existing confusion.

Mr. Mechem in his Treatise on the Law of Agency, 2nd Ed. Vol. 2, points out that the subject of discussion has not very frequently arisen in the United States and has not been thoroughly considered in any recent case by a court of last resort. It is interesting to note that the case of

*Emerson* v. *Patch* (Mass.), *supra,* was decided in 1878; and the case of *Fradley* v. *Hyland, supra,* was decided in 1888; the case of *Montague Mailing Machinery Co.* v. *All-Package Grocery Stores Co., Inc., et al., supra,* was decided in 1918; and the case of *Southern Ry. Co.* v. *Simpkins Company, supra,* was decided in 1919. The Commentaries on the Law of Agency by Judge Story were published in 1843.

In arriving at his conclusion that the law as now set forth in the Restatement was the correct law, Mr. Mechem had this to say in his Treatise on the Law of Agency, 2nd Ed. § 1749, Vol. II,

> "Nevertheless, the rule of Parke, B., seems on the whole to be reasonable and just. If a principal sends an agent to buy goods for him and on his account, it is not unreasonable that he should see that they are paid for. Although the seller may consider the agent to be the principal, the actual principal knows better. He can easily protect himself by insisting upon evidence that the goods have been paid for or that the seller with full knowledge of the facts has elected to rely upon the responsibility of the agent, and if he does not, but, except where misled by some action of the seller, voluntarily pays the agent without knowing that he has paid the seller, there is no hardship in requiring him to pay again. If the other party has the right, within a reasonable time, to charge the undisclosed principal upon his discovery, - - and this right seems to be abundantly settled in the law of agency - - it is difficult to see how this right of the other party can be defeated, while he is not himself in fault, by dealings between the principal and the agent, of which he had no knowledge, and to which he was not a party."

It is interesting to note that this work on Agency by Mechem was published in 1914.

We think it is pertinent at this point to record something of the establishment, organization and object of the Amer-

ican Law Institute. The Institute was organized on February 23, 1923. The organization meeting was attended by the Chief Justice of the United States, and other representatives of the Supreme Court, representatives of the United States Circuit Courts of Appeals, the highest courts of a majority of the States, the Association of American Law Schools, and the American and State Bar Associations. The Institute was composed of Justices of the Supreme Court of the United States, senior judges of the United States Circuit Courts of Appeals, the chief justices of the highest courts of the several States, and president and members of the Executive Committee of the American Bar Association, the presidents of certain learned legal societies, and the deans of member schools of the Association of American Law Schools. Its object as expressed in its charter was "to promote the clarification and simplification of the law and its better adaptation to social needs, to secure the better administration of justice and to carry on scholarly and scientific legal work."

The Restatement may be regarded both as the product of expert opinion and as the expression of the law by the legal profession.

The Committee on Agency which prepared the Restatement of the Law of Agency was composed of outstanding representatives of the leading law schools of the country. It was headed by Mr. Floyd R. Mechem, who at the time was regarded as the foremost living authority on the subject of agency. Its rule as set forth in § 208 promulgated on May 4, 1933 expounds the thinking of some of the best legal minds in the country.

The purpose of the Institute in the promotion of clarification of the law can be applied to no more needy situation than that of the question before us for determination. It is our opinion that the reasoning of Mr. Mechem in support of the doctrine promulgated in the Restatement is sound.

The adoption of this doctrine by this court will establish a clear cut and explicit rule of law free from the confusion, complications and perplexities which have existed throughout the years.

We, therefore, adopt the rule as laid down in the Restatement of the Law of Agency.

Having already ruled that the Company was the duly authorized agent of Superior and that when it purchased the wood from the plaintiff, it was acting within the scope of its authority, we now rule that the referee applied the proper law and that his decision was correct and should be affirmed.

*Exceptions overruled.*