A. GAY JENSON FARMS CO., et al., Respondents,

v.

CARGILL, INCORPORATED, Appellant,

Warren Grain & Seed Company, et al., Defendants.

No. 50744.

Supreme Court of Minnesota.

Aug. 14, 1981.

Rehearing Denied Oct. 8, 1981.

Lowe & Schmidthuber, Robert L. Lowe
and James E. Lindell, Minneapolis, for ap-
pellant.

Gordon J. Berg and John G. Berg, Minne-
apolis, for respondents.

Meagher, Geer, Markham, Anderson, Ad-
amson, Flaskamp & Brennan, O. C. Adam-
son II, Clyde F. Anderson and James F.
Roegge, Minneapolis, for respondents.

Faegre & Benson, Lawrence C. Brown
and Michael R. Stewart, Minneapolis, for
Northwestern Nat. Bank of Minneapolis.

Nelson, Njus & Nettles, Jerold O. Nelson
and Alan R. Nettles, Minneapolis, for
Northwest Country Elevator Association
and North Dakota Grain Dealers Associa-
tion.

## OPINION

PETERSON, Justice.

Plaintiffs, 86 individual, partnership or
corporate farmers, brought this action

against defendant Cargill, Inc. (Cargill) and defendant Warren Grain & Seed Co. (Warren) to recover losses sustained when Warren defaulted on the contracts made with plaintiffs for the sale of grain. After a trial by jury, judgment was entered in favor of plaintiffs, and Cargill brought this appeal. We affirm.

This case arose out of the financial collapse of defendant Warren Seed & Grain Co., and its failure to satisfy its indebtedness to plaintiffs. Warren, which was located in Warren, Minnesota, was operated by Lloyd Hill and his son, Gary Hill. Warren operated a grain elevator and as a result was involved in the purchase of cash or market grain from local farmers. The cash grain would be resold through the Minneapolis Grain Exchange or to the terminal grain companies directly. Warren also stored grain for farmers and sold chemicals, fertilizer and steel storage bins. In addition, it operated a seed business which involved buying seed grain from farmers, processing it and reselling it for seed to farmers and local elevators.

Lloyd Hill decided in 1964 to apply for financing from Cargill.[1] Cargill's officials from the Moorhead regional office investigated Warren's operations and recommended that Cargill finance Warren.

Warren and Cargill thereafter entered into a security agreement which provided that Cargill would loan money for working capital to Warren on "open account" financing up to a stated limit, which was originally set as $175,000.[2] Under this contract, Warren would receive funds and pay its expenses by issuing drafts drawn on Cargill through Minneapolis banks. The drafts were imprinted with both Warren's and Cargill's names. Proceeds from Warren's sales would be deposited with Cargill and credited to its account. In return for this financing, Warren appointed Cargill as its grain agent for transaction with the Commodity Credit Corporation. Cargill was also given a right of first refusal to purchase market grain sold by Warren to the terminal market.

A new contract was negotiated in 1967, extending Warren's credit line to $300,000 and incorporating the provisions of the original contract. It was also stated in the contract that Warren would provide Cargill with annual financial statements and that either Cargill would keep the books for Warren or an audit would be conducted by an independent firm. Cargill was given the right of access to Warren's books for inspection.

In addition, the agreement provided that Warren was not to make capital improvements or repairs in excess of $5,000 without Cargill's prior consent. Further, it was not to become liable as guarantor on another's indebtedness, or encumber its assets except with Cargill's permission. Consent by Cargill was required before Warren would be allowed to declare a dividend or sell and purchase stock.

Officials from Cargill's regional office made a brief visit to Warren shortly after the agreement was executed. They examined the annual statement and the accounts receivable, expenses, inventory, seed, machinery and other financial matters. Warren was informed that it would be reminded periodically to make the improvements recommended by Cargill.[3] At approximately this time, a memo was given to the Cargill official in charge of the Warren account,

1. Prior to this time, Atwood Larson had provided working capital for Warren, and Warren had used Atwood Larson as its commission agent for the sale of market grain on the grain exchange.

2. Loans were secured by a second mortgage on Warren's real estate and a first chattel mortgage on its inventories of grain and merchandise in the sum of $175,000 with 7% interest. Warren was to use the $175,000 to pay off the debt that it owed to Atwood Larson.

3. Cargill headquarters suggested that the regional office check Warren monthly. Also, it was requested that Warren be given an explanation for the relatively large withdrawals from undistributed earnings made by the Hills, since Cargill hoped that Warren's profits would be used to decrease its debt balance. Cargill asked for written requests for withdrawals from undistributed earnings in the future.

Erhart Becker, which stated in part: "This organization [Warren] needs very strong paternal guidance."

In 1970, Cargill contracted with Warren and other elevators to act as its agent to seek growers for a new type of wheat called Bounty 208. Warren, as Cargill's agent for this project, entered into contracts for the growing of the wheat seed, with Cargill named as the contracting party. Farmers were paid directly by Cargill for the seed and all contracts were performed in full. In 1971, pursuant to an agency contract, Warren contracted on Cargill's behalf with various farmers for the growing of sunflower seeds for Cargill. The arrangements were similar to those made in the Bounty 208 contracts, and all those contracts were also completed. Both these agreements were unrelated to the open account financing contract. In addition, Warren, as Cargill's agent in the sunflower seed business, cleaned and packaged the seed in Cargill bags.

During this period, Cargill continued to review Warren's operations and expenses and recommend that certain actions should be taken.[4] Warren purchased from Cargill various business forms printed by Cargill and received sample forms from Cargill which Warren used to develop its own business forms.

Cargill wrote to its regional office in 1970 expressing its concern that the pattern of increased use of funds allowed to develop at Warren was similar to that involved in two other cases in which Cargill experienced severe losses. Cargill did not refuse to honor drafts or call the loan, however. A new security agreement which increased the credit line to $750,000 was executed in 1972, and a subsequent agreement which raised the limit to $1,250,000 was entered into in 1976.

Warren was at that time shipping Cargill 90% of its cash grain. When Cargill's facilities were full, Warren shipped its grain to other companies. Approximately 25% of Warren's total sales was seed grain which was sold directly by Warren to its customers.

As Warren's indebtedness continued to be in excess of its credit line, Cargill began to contact Warren daily regarding its financial affairs. Cargill headquarters informed its regional office in 1973 that, since Cargill money was being used, Warren should realize that Cargill had the right to make some critical decisions regarding the use of the funds. Cargill headquarters also told Warren that a regional manager would be working with Warren on a day-to-day basis as well as in monthly planning meetings. In 1975, Cargill's regional office began to keep a daily debit position on Warren. A bank account was opened in Warren's name on which Warren could draw checks in 1976. The account was to be funded by drafts drawn on Cargill by the local bank.

In early 1977, it became evident that Warren had serious financial problems. Several farmers, who had heard that Warren's checks were not being paid, inquired or had their agents inquire at Cargill regarding Warren's status and were initially told that there would be no problem with payment. In April 1977, an audit of Warren revealed that Warren was $4 million in debt. After Cargill was informed that Warren's financial statements had been deliberately falsified, Warren's request for additional financing was refused. In the final days of Warren's operation, Cargill sent an official to supervise the elevator, including disbursement of funds and income generated by the elevator.

After Warren ceased operations, it was found to be indebted to Cargill in the amount of $3.6 million. Warren was also

---

4. Between 1967 and 1973, Cargill suggested that Warren take a number of steps, including: (1) a reduction of seed grain and cash grain inventories; (2) improved collection of accounts receivable; (3) reduction or elimination of its wholesale seed business and its specialty grain operation; (4) marketing fertilizer and steel bins on consignment; (5) a reduction in withdrawals made by officers; (6) a suggestion that Warren's bookkeeper not issue her own salary checks; and (7) cooperation with Cargill in implementing the recommendations. These ideas were apparently never implemented, however.

determined to be indebted to plaintiffs in the amount of $2 million, and plaintiffs brought this action in 1977 to seek recovery of that sum. Plaintiffs alleged that Cargill was jointly liable for Warren's indebtedness as it had acted as principal for the grain elevator.[5]

The matter was bifurcated for trial in Marshall County District Court. In the first phase, the amount of damages sustained by each farmer was determined by the court. The second phase of the action, dealing with the issue of Cargill's liability for the indebtedness of Warren, was tried before a jury.

The jury found that Cargill's conduct between 1973 and 1977 had made it Warren's principal.[6] Warren was found to be the agent of Cargill with regard to contracts for:

1. The purchase and sale of grain for market.

2. The purchase and sale of seed grain.

3. The storage of grain.

The court determined that Cargill was the disclosed principal of Warren. It was concluded that Cargill was jointly liable with Warren for plaintiffs' losses, and judgment was entered for plaintiffs.

Cargill seeks a reversal of the jury's findings or, if the jury findings are upheld, a reversal of the trial court's determination that Cargill was a disclosed principal. In the alternative, Cargill requests that the court order a new trial based upon the trial court's error in (1) denying Cargill's requested jury instructions; (2) refusing to admit relevant evidence; and (3) denying Cargill's motion for change of venue. Northwestern County Elevator Association, North Dakota Grain Dealers Association and Northwestern National Bank of Minneapolis have all filed briefs on appeal as amici curiae, seeking to have the jury verdict reversed.

1. The major issue in this case is whether Cargill, by its course of dealing with Warren, became liable as a principal on contracts made by Warren with plaintiffs. Cargill contends that no agency relationship was established with Warren, notwithstanding its financing of Warren's operation and its purchase of the majority of Warren's grain. However, we conclude that Cargill, by its control and influence over Warren, became a principal with liability for the transactions entered into by its agent Warren.

Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. *Jurek v. Thompson*, 308 Minn. 191, 241 N.W.2d 788 (1976); *Lee v. Peoples Cooperative Sales Agency*, 201 Minn. 266, 276 N.W. 214 (1937); Restatement (Second) of Agency § 1 (1958). In order to create an agency there must be an agreement, but not necessarily a contract between the parties. Restatement (Second) of Agency § 1, comment b (1958). An agreement may result in the creation of an agency relationship although the parties did not call it an agency and did not intend the legal consequences of the relation to follow. *Id.* The existence of the agency may be proved by circumstantial evidence which shows a course of dealing between the two parties. *Rausch v. Aronson*, 211 Minn. 272, 1 N.W.2d 371 (1941). When an agency relationship is to be proven by circumstantial evidence, the principal must be shown to have consented to the agency since one cannot be the agent of another except by consent of the latter. *Larkin v. McCabe*, 211 Minn. 11, 299 N.W. 649 (1941).

Cargill contends that the prerequisites of an agency relationship did not exist because Cargill never consented to the

---

**5.** Count I of plaintiffs' complaint, which alleged that Cargill and Warren had violated the Minnesota Anti-Trust Law, Minn.Stat. § 325D.51 (1980), was dismissed by the court.

**6.** At trial, plaintiffs sought to establish actual agency by Cargill's course of dealing between 1973 and 1977 rather than "apparent" agency or agency by estoppel, so that the only issue in this case is one of actual agency.

agency, Warren did not act on behalf of Cargill, and Cargill did not exercise control over Warren. We hold that all three elements of agency could be found in the particular circumstances of this case. By directing Warren to implement its recommendations, Cargill manifested its consent that Warren would be its agent. Warren acted on Cargill's behalf in procuring grain for Cargill as the part of its normal operations which were totally financed by Cargill.[7] Further, an agency relationship was established by Cargill's interference with the internal affairs of Warren, which constituted de facto control of the elevator.

A creditor who assumes control of his debtor's business may become liable as principal for the acts of the debtor in connection with the business. Restatement (Second) of Agency § 14 O (1958). It is noted in comment a to section 14 O that:

> A security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. However, if he takes over the management of the debtor's business either in person or through an agent, and directs what contracts may or may not be made, he becomes a principal, liable as a principal for the obligations incurred thereafter in the normal course of business by the debtor who has now become his general agent. The point at which the creditor becomes a principal is that at which he assumes de facto control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be.

A number of factors indicate Cargill's control over Warren, including the following:

(1) Cargill's constant recommendations to Warren by telephone;

(2) Cargill's right of first refusal on grain;

(3) Warren's inability to enter into mortgages, to purchase stock or to pay dividends without Cargill's approval;

(4) Cargill's right of entry onto Warren's premises to carry on periodic checks and audits;

(5) Cargill's correspondence and criticism regarding Warren's finances, officers salaries and inventory;

(6) Cargill's determination that Warren needed "strong paternal guidance";

(7) Provision of drafts and forms to Warren upon which Cargill's name was imprinted;

(8) Financing of all Warren's purchases of grain and operating expenses; and

(9) Cargill's power to discontinue the financing of Warren's operations.

We recognize that some of these elements, as Cargill contends, are found in an ordinary debtor-creditor relationship. However, these factors cannot be considered in isolation, but, rather, they must be viewed in light of all the circumstances surrounding Cargill's aggressive financing of Warren.

It is also Cargill's position that the relationship between Cargill and Warren was that of buyer-supplier rather than principal-agent. Restatement (Second) of Agency § 14K (1958) compares an agent with a supplier as follows:

> One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself.

Factors indicating that one is a supplier, rather than an agent, are:

> (1) That he is to receive a fixed price for the property irrespective of price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which thereafter is to transfer. (3) That he has

---

**7.** Although the contracts with the farmers were executed by Warren, Warren paid for the grain with drafts drawn on Cargill. While this is not in itself significant—*see Lee v. Peoples Cooper-* *ative Sales Agency,* 201 Minn. 266, 276 N.W. 214 (1937)—it is one factor to be taken into account in analyzing the relationship between Warren and Cargill.

an independent business in buying and selling similar property.

Restatement (Second) of Agency § 14K, comment a (1958).

■ Under the Restatement approach, it must be shown that the supplier has an independent business before it can be concluded that he is not an agent. The record establishes that all portions of Warren's operation were financed by Cargill and that Warren sold almost all of its market grain to Cargill. Thus, the relationship which existed between the parties was not merely that of buyer and supplier.

A case analogous to the present one is *Butler v. Bunge Corporation*, 329 F.Supp. 47 (N.D.Miss.1971). In *Butler*, the plaintiff brought an action to recover the price of a soybean crop sold to an elevator that was operated by Bayles, a purported agent of the defendant Bunge Corporation. Bayles had agreed to operate a former Bunge elevator pursuant to an agreement in which Bayles was designated as manager. Although Bunge contended that Bayles was an independent contractor, the court determined that the elevator was an agent of Bunge.[8]

In this case, as in *Butler*, Cargill furnished substantially all funds received by the elevator. Cargill did have a right of entry on Warren's premises, and it, like Bunge, required maintenance of insurance against hazards of operation. Warren's ac-

tivities, like Bayles' operations, formed a substantial part of Cargill's business that was developed in that area. In addition, Cargill did not think of Warren as an operator who was free to become Cargill's competitor, but rather conceded that it believed that Warren owed a duty of loyalty to Cargill. The decisions made by Warren were not independent of Cargill's interest or its control.

Further, we are not persuaded by the fact that Warren was not one of the "line" elevators that Cargill operated in its own name. The Warren operation, like the line elevator, was financially dependent on Cargill's continual infusion of capital. The arrangement with Warren presented a convenient alternative to the establishment of a line elevator. Cargill became, in essence, the owner of the operation without the accompanying legal indicia.

The amici curiae assert that, if the jury verdict is upheld, firms and banks which have provided business loans to county elevators will decline to make further loans. The decision in this case should give no cause for such concern. We deal here with a business enterprise markedly different from an ordinary bank financing, since Cargill was an active participant in Warren's operations rather than simply a financier. Cargill's course of dealing with Warren was, by its own admission, a paternalistic relationship in which Cargill made the key

**8.** In *Butler v. Bunge Corporation*, 329 F.Supp. 47 (N.D.Miss.1971), the evidence revealed the following indicia of agency:

(1) Bunge furnished all or practically all of the means and appliances for the work; (2) Bunge furnished substantially all funds received by Bayles; (3) Bunge controlled the destination of all grain handled by Bayles; (4) Bunge controlled the price, weights and grades of all grain handled by Bayles; (5) Bunge, on certain occasions, permitted Bayles to sell a limited quantity of grain to other buyers; (6) Bunge not only had the right to direct details important to grain buying but gave actual direction to Bayles through constant contact, quoting its price to him and consulting with him regarding prices for the farmers; (7) Bunge had a significant degree of control over the operation of the grain elevator at Roundaway in such areas as training Bayles' personnel, inspecting the

premises and requiring maintenance of insurance against hazards of operation; (8) Bayles' grain transaction with farmers was the identical type of business activity that was regularly carried on by Bunge, and Bayles' transactions formed a substantial part of Bunge's business that was developed from the area in which Coahoma Grain Elevator operated; and finally (9) although the agreement formally specified a fixed term, the relationship between the parties had no viability apart from grain dealings that were wholly subject to Bunge's will. These findings make clear that Bunge did not consider Bayles an independent operator who was free to become Bunge's competitor in buying grain from the farmers in the region, but rather that he was effectually given authority to buy grain from Bunge.

*Id.* at 61.

economic decisions and kept Warren in existence.

Although considerable interest was paid by Warren on the loan, the reason for Cargill's financing of Warren was not to make money as a lender but, rather, to establish a source of market grain for its business. As one Cargill manager noted, "We were staying in there because we wanted the grain." For this reason, Cargill was willing to extend the credit line far beyond the amount originally allocated to Warren. It is noteworthy that Cargill was receiving significant amounts of grain and that, notwithstanding the risk that was recognized by Cargill, the operation was considered profitable.

On the whole, there was a unique fabric in the relationship between Cargill and Warren which varies from that found in normal debtor-creditor situations. We conclude that, on the facts of this case, there was sufficient evidence from which the jury could find that Cargill was the principal of Warren within the definitions of agency set forth in Restatement (Second) of Agency §§ 1 and 140.

■■ 2. Cargill argues that even if it were established that Cargill was Warren's principal in regard to this transaction, Cargill could only be an undisclosed principal because plaintiffs failed to establish that they had notice of a principal. *See* Restatement (Second) of Agency § 4 (1958). It asserts that, as an undisclosed principal, it should not be held liable on contracts made by its agent since it settled with the purported agent prior to notice of any third-party claims.

By consent of the parties, the trial court agreed to decide the issue regarding whether Cargill was an undisclosed or disclosed principal. Although the court noted that it could reasonably refuse to make the requested finding, it chose to rule that, as a matter of fact, Cargill was a disclosed principal.

From the facts in the record, it is unclear whether plaintiffs were on notice that Warren was acting on Cargill's behalf. However, it is not necessary to decide whether Cargill was a disclosed or undisclosed principal. We believe that Cargill cannot avoid its liability to plaintiffs by payment to its agent even if it had operated as an undisclosed principal.

The question of whether payment in good faith to an agent relieves a principal of liability to a third party has not previously been decided in Minnesota. Although there is little recent authority, a majority of jurisdictions recognize the English or older rule that payment by an undisclosed principal without notice is a good defense to any claim asserted by a third party.[9] *See Shasta Livestock Auction Yard, Inc. v. Bill Evans Cattle Management Corp.*, 375 F.Supp. 1027 (D. Idaho 1974). The modern view, which has been adopted by a minority of states, is expressed in Restatement (Second) of Agency § 208 (1958), which provides:

> An undisclosed principal is not discharged from liability to the other party to a transaction conducted by an agent by payment to, or settlement of accounts with, the agent, unless he does so in reasonable reliance upon conduct of the other party which is not induced by the agent's misrepresentations and which indicates that the agent has settled the account.

*See Poretta v. Superior Dowel Company*, 153 Me. 308, 137 A.2d 361 (1958).

We now adopt the modern position set forth in the Restatement rule. We believe that this rule is the better principle to be

---

9. The majority position was based on some of the leading English cases of the first half of the nineteenth century which were overruled by later English cases. Annot., 71 A.L.R.2d 911, 915 (1960). American courts, while overwhelmingly adopting the Restatement rule that a disclosed or partially disclosed principal is not discharged from liability to a third party by payment to its agent, continued to adhere to the early English view regarding undisclosed principals.

In *American Fund for Public Service v. Associates Textile*, 187 Minn. 300, 245 N.W. 376 (1932), this court cited the majority rule but stated that it did not need to decide whether to adopt it since other facts indicated that the principal should be held personally liable.

followed since the undisclosed principal is aware that he will become liable under the original transaction, and he should not be able to escape his liability by payment to the agent. Seavey, *Undisclosed Principal; Unsettled Problems,* 1 Howard L.J. 79, 84 (1955). As one commentator observed:

> [T]he [modern] rule of Park, B., seems on the whole to be reasonable and just. If the principal sends an agent to buy goods for him and on his account, it is not unreasonable that he should see that they are paid for. Although the seller may consider the agent to be the principal, the actual principal knows better. He can easily protect himself by insisting upon evidence that the goods have been paid for or that the seller with full knowledge of the facts has elected to rely upon the responsibility of the agent, and if he does not, but, except where misled by some action of the seller, voluntarily pays to the agent without knowing that he has paid the seller, there is no hardship in requiring him to pay again.

2 F. Mechem, *A Treatise on the Law of Agency* § 1749 (1914).

Since plaintiffs did not indicate to Cargill that Warren had settled their accounts, Cargill, as principal, is not discharged from liability to plaintiffs by payment to Warren.

3. It is also Cargill's position that the trial court erred in failing to submit certain requested jury instructions.

■ Cargill claims, first, that Restatement (Second) of Agency § 1 should have been given instead of 4 Minn. Dist. Judges Ass'n, Minnesota Practice, JIG II, § 250 (2d ed. 1974) as the latter instruction specifically states that it is to be used for tort cases only and that it must be modified before it can be used in contract cases. The essence of Restatement (Second) of Agency § 1 (1958) and JIG, § 250 are the same. In fact, since the latter provision requires actual physical control as an element, it was favorable rather than harmful to Cargill. *See Jurek v. Thompson,* 308 Minn. at 199 n.4, 241 N.W.2d at 792 n.4. Consequently, Cargill's contention on this issue is without merit.

■ Cargill asserts, second, that the trial court erred in refusing to instruct on the issue that agency to perform a particular act cannot be inferred by the existence of agency relationship at another time and in a different capacity. Cargill is concerned that the testimony regarding the agency relationship in the sunflower and Bounty 208 program between Cargill and Warren created an inference that this relationship extended to other aspects of Warren's operations. The court, however, is not required to instruct against every improper inference that a jury could draw. Also, it was pointed out by Cargill's counsel in closing argument that the Bounty 208 contracts were completed in 1970–1971, and the relevant time period for the agency in this case was stated by the court as 1973 to 1977. Thus, the failure to give the requested instruction was not reversible error.

■ Cargill's third contention is that the trial court erred in not submitting to the jury an instruction, in the form of Restatement (Second) of Agency § 14K and comment a to that section, which would serve to focus on some, but not all, of the applicable factors. The instruction could have confused the jury since Cargill asserted only a buyer-supplier relationship to the part of Warren's operation involving purchase and resale of market grain. The court's instruction on general agency law was adequate to inform the jury of the applicable principle of law. This is especially true in light of the fact that there are no recent Minnesota cases which interpret section 14K or apply it to situations similar to those in the instant case. Thus, the court gave a proper instruction in accordance with the controlling case law.

■ 4. Cargill asserts that it was error for the trial court to exclude evidence that Warren had been sued in prior years by farmers for breach of contract, and Warren had neither asked Cargill to defend these suits nor notified Cargill that these suits had been brought. One customer who had previously brought an action against Warren was A. Gay Jenson, a plaintiff in this case.

The trial court properly determined that the particular transaction involved had no probative evidentiary value on the issues involved in this case. Any relevance, which would have required detailed evidence to find similarity between cases so as to create an inference useable in the present case, was outweighed by the likelihood of confusion of the jury. As the trial court noted, evidence would have been submitted on lawsuits concerning contracts which were not involved in this case. It could be concluded, therefore, that the court did not err in excluding this collateral evidence.

■ 5. Finally, Cargill claims that the trial court's denial of its motion for a change of venue was improper. Cargill moved for a change of venue pursuant to Minn.Stat. § 542.11 (1980), because it was not satisfied with the impartiality of the jury. Section 542.11 permits the trial court to exercise its discretion in determining when a change of venue is appropriate.

Minnesota District Court Rule 29 states:

A change of venue shall not be granted under the provisions of section 542.11, unless the party applying therefor uses due diligence to procure the same within a reasonable time after issue has been joined in the action and the ground for the change has come to the knowledge of the applicant. Nor shall a change be granted where the other party will lose the benefit of a term, unless the party asking for such change shall move therefor at the earliest reasonable opportunity after issue has been joined and he has information of the ground of such change.

Cargill's motion was made during the jury selection process. On group examination, 26 of the 60 veniremen were excused for cause, either because of relationship to the parties or because of prejudice. Of the 14 jurors who were seated, 2 were excused for cause. Several of the jurors said that they had information concerning the case. The trial court noted that all 14 jurors, including the 2 excused for cause, said that they would lay aside their impressions and opinions and render a fair and impartial decision.

The mere fact that the jury had knowledge of the financial collapse of Warren and its connection with Cargill does not indicate that it could not render a fair decision.[10] Further, Cargill had 13 months from the filing of the lawsuit to commencement of the trial to ascertain that Warren was a small community and that jurors from that area could be presumed to have some association with the elevator or with one of the 86 plaintiffs. Also, Cargill's counsel, as well as plaintiffs' counsel, referred to the economic impact of the decision on the community. Thus, the trial court's denial of a change of venue was a proper exercise of discretion.

Affirmed.

SIMONETT, J., took no part in the consideration or decision of this case.

---

10. The jury apparently took its task seriously. It returned to the court and asked the judge to restate the definition of agency 3 hours after it had retired to the jury room. It rendered a verdict approximately 4 hours after this second instruction.