640

## NELSON, et al. *v.* SLAY, et al.

Feb. 23, 1953

No. 38664     21 Adv. S. 52     63 So. 2d 46

*W. W. Hewitt, E. C. Barlow* and *Wright, Overstreet &*
*Kuykendall,* for appellants.

642

*Young & Daniel,* for appellees.

ETHRIDGE, J.

Appellants, Minnie Nelson and two dependent step-grandchildren of deceased, Andrew Nelson, filed their claims for workmen's compensation before the Mississippi Workmen's Compensation Commission for the death of Andrew Nelson, husband and step-grandfather of appellants. Appellees, J. W. Slay and his compensation insurance carrier, Liberty Mutual Insurance Company, contested the claims. Appellants are dependents of deceased and his death arose out of and in the course of his work. The only question is whether there is substantial evidence to support the finding of the attorney-referee that Andrew Nelson was not an employee of J. W. Slay. The claims for compensation were denied by the attorney-referee, the Commission, and the Circuit Court of Franklin County.

J. W. Slay lives in Brookhaven and is engaged in the business of buying pulpwood. He buys only in freight car lots from about twenty-five different producers of pulpwood. He sells it to Gaylord Container Corporation in Bogalusa, Louisiana. The general method of handling purchases of such pulpwood is to have the person who is producing and selling it to him to load a freight car which has been placed on a siding by Slay. This general practice was followed in the case of Andrew Nelson, who was loading such a car and selling pulpwood to Slay on July

29, 1949, when he was killed by a tree falling on him. At that time Nelson was cutting pulpwood on the property of Mrs. M. I. Butler. Slay testified that he had nothing to do with obtaining this pulpwood from Mrs. Butler, and that Nelson made those arrangements himself. There is some testimony in general terms by appellant Minnie Nelson, the widow, and by deceased's sons, who were working for their father at the time, that Nelson was cutting the timber "for J. W. Slay," but that evidence is not based upon personal knowledge of the witnesses, and in this sense Slay's testimony is not substantially contradicted, to the effect that he had nothing to do with obtaining the timber from Mrs. Butler, and that Nelson purchased it from her. Mrs. Butler did not testify.

Slay had purchased carloads of pulpwood from Nelson on ten different occasions in the year 1949. Slay testified that Nelson was one of the many persons from whom he purchased pulpwood; that he arranged for the freight car to be placed at a designated siding for Nelson to load in July 1949; that in addition to Nelson obtaining the timber rights for himself, Nelson hired his own employees, paid them himself, and had the sole right to hire and fire them; that Nelson owned his own truck, determined his own routes for hauling the timber, furnished his own equipment to cut and load the wood, and otherwise managed all of his activities in cutting and loading the pulpwood. Slay did not go to the Butler tract to see what Nelson was doing, and did not supervise or have the right to supervise Nelson's activities. He did not know who or how many employees Nelson had, nor did he prescribe any routes for Nelson to follow or tell Nelson when and where he could work. When there was any delay in loading the car, the railroad's charge of demurrage was paid by the producer, Nelson. Nelson did not work regularly in loading wood on cars in behalf of Slay. The car which was being loaded at Nelson's death on July 29th was the first car of pulpwood that Nelson had sold to Slay since

May 30th. After Nelson's death the car was not completed by Nelson's sons, but Slay obtained wood from another source to complete its loading. During the period prior to his death, Nelson was selling pulpwood to other pulpwood dealers. C. E. Bearden testified that on July 19th and 20th Nelson had sold him two carloads of pulpwood, and after Nelson's death Bearden also bought two carloads of pulpwood from Nelson's sons, which was cut off of the Butler tract. Clyde Terrell testified that he purchased pulpwood from Nelson between January and May 1949, and that after Nelson's death he purchased one load of wood from Nelson's sons which came from the Butler tract.

Slay had owned a truck which Nelson purchased from him. After a few months Nelson was not making payments to Slay on it, so Nelson got a bank to loan him the money on it with which to pay Slay, and Slay endorsed Nelson's note to the bank. Nelson bought the license for his truck which was in use at the time of Nelson's death. From time to time Slay "stood" for repair bills on the truck for Nelson, but on the settlements between Slay and Nelson the amount thereof would be credited to Slay. Slay, in his settlements with Nelson after a purchase of a carload of pulpwood, would also deduct therefrom the monthly payments of $100 which Nelson owed the bank, and would remit those installments to the bank. Slay paid Nelson a unit price for each cord of pulpwood bought.

When the car would be loaded by Nelson, a bill of lading would be obtained from the railroad, and Slay would be designated in it as the consignee at Bogalusa. The wood would then be shipped to Slay at that address. He sold it to Gaylord Container Corporation, which would scale it and pay Slay for it. When the bill of lading would be filled out to Slay as consignee, he would advance about $100 to the producer, Nelson here. After Gaylord computed what it owed Slay for the carload, it would deduct from that amount the state timber sever-

ance tax, Nelson's proportion of the workmen's compensation insurance premium, measured by the units sold to Slay, and stumpage, or the price to be paid to the landowner for the timber. In turn Slay, in his settlement with Nelson, would deduct from the amount owing Nelson those same items, severance tax, Nelson's pro rata portion of the workmen's compensation insurance premium, and stumpage. The stumpage was then paid directly to the landowner, the severance tax to the state, and the compensation insurance premium to the insurance carrier.

A policy was issued to Slay by appellee, Liberty Mutual Insurance Company, naming J. W. Slay as "employer," making no reference to Nelson or anyone else, and stating as a "classification of operations" of Slay the following:

"Logging or Lumbering—pulpwood exclusively —including transportation of logs to mill; construction, operation, maintenance or extension of logging roads or logging railroads; Drivers, Chauffeurs and their Helpers. (Mill operations to be separately rated)."

After Nelson's death on July 29th, Slay made an "Employers First Report of Industrial Injury" to the Workmen's Compensation Commission on August 1st. This report, a printed form, filled in by Slay, designated him as "employer" and the "injured employee" as Andrew Nelson. Slay testified that he purchased the policy to protect himself and Andrew Nelson, and other contractors or persons from whom he purchased pulpwood; that a similar deduction for the pro rata premium for each seller of pulpwood was made with the various pulpwood sellers; that the purpose of the policy was to cover his employees and those of Nelson's and other sellers of pulpwood; that at that time in the pulpwood industry there was considerable doubt as to the extent of the application of the statutory employee provision of the Workmen's Compensation Act.

██ ██ The attorney-referee found as a fact under this evidence that Nelson had made his own arrangements with Mrs. Butler for the cutting of this pulpwood, and that he was not an employee of Slay, but that the relationship was that of vendor and vendee. Hence the claims of appellants were denied. The Commission and the circuit court affirmed this finding. The question before us is whether there was substantial evidence to support these findings of the trier of fact. Brown Buick Company v. Smith's Estate, 52 So. 2d 664 (Miss. 1951); Sones v. Southern Lbr. Co., 60 So. 2d 582 (Miss. 1952). We think that the great weight of the evidence supports the finding of the attorney-referee.

Most of the testimony as outlined above is substantially uncontradicted. The essential problem is to determine the proper legal conclusion from these facts. Slay was simply a purchaser of this pulpwood from Nelson. Nelson arranged for the timber on the Butler tract, furnished his own equipment and truck, hired and fired his own employees and controlled all of his operations in cutting the timber and loading it on the freight car. Slay did not supervise the cutting operations on the Butler tract and had no right to do so. He had nothing to do with hiring Nelson's employees, nor did he prescribe any routes or details in Nelson's performance. He was interested only in the end-result, a freight car loaded with the proper type of pulpwood. That Nelson was a vendor rather than an employee is further evidenced by the fact that Nelson sold pulpwood for several months before his death to other purchasers of that commodity. ██ ██ The fact that Slay sold Nelson a truck and assisted him in financing it is a circumstance, but here not a material one, in determining the relationship of the parties. Reeves v. Muskogee Cotton Oil Company, 187 Okla. 539, 104 Pac. 2d 443 (1940). Also a circumstance to be considered, but not determinative in the light of all of the other evidence, is the method of financial settlement between the parties,

by which Slay withheld severance tax and stumpage. The parties had a right to agree that Slay could protect himself in disbursing those items, without changing the vendor-vendee relationship. Anthony v. Natalbany Lumber Co., Ltd., 187 So. 289 (La. 1939); Taylor v. Employers Mutual Liability Insurance Co., 220 La. 995, 58 So. 2d 206 (1952).

▇▇▇ Also a fact to be considered but not controlling here is that Slay, in his settlements with Nelson and the numerous other producers of pulpwood from whom he bought, deducted each producer's, including Nelson's, pro rata part of a workmen's compensation policy premium insuring Slay. The premium rate was 32 cents per cord, without reference to payroll or to whom the pulpwood was purchased from or who was covered. No reference was made to Nelson in the policy and its apparent purpose was to protect Slay from a possible judicial determination that he was a statutory employer of an injured employee of Nelson or of other producers. The report of the accident which Slay made to the Commission on August 1st, in which Nelson was designated as an "employee," must be weighed in the light of, and against all of the other evidence in this case. When that is done we do not think it would suffice to change the manifest relationship of vendor-vendee to that of employee-employer.

A somewhat analogous recent decision finding the existence of a vendor-vendee relationship is Taylor v. Employers Mutual Liability Insurance Co., *supra*. To the same effect in principle are Harris v. Southern Kraft Corp., 183 So. 65 (La. 1938); Wilson v. Roberts, 194 So. 88 (La. 1940); Hatch v. Industrial Lbr. Co., 199 So. 587 (La. 1941); Williams v. George, 15 So. 2d 823 (La. 1943); McDonald v. Hammond Box Co., Inc., 17 So. 2d 39 (La. 1944); De Bose v. Kelly, 37 So. 2d 382 (La. 1948). Appellants rely upon Sones v. Southern Lbr. Co., 60 So. 2d 582 (Miss. 1952), which involved entirely different facts.

There Gipson, the sawmill owner, owned the timber from which Johnson was cutting logs. Sones was hired by Johnson. Gipson furnished the means and appliances for the work, furnished the material upon which the work was done, had control of the premises, and the rights to prescribe the details of the work and to supervise it. It was held that these and other facts evidenced that the so-called contractor was not in fact an independent contractor. None of those circumstances existed in the present case. Nor was Nelson an independent contractor in the common-law sense of that term. He was not contracted with by Slay to do any particular job or to reach any particular result. He simply sold pulpwood to Slay for a fixed price when Slay was willing to buy it in a carload lot from Nelson. More analogous in its general, legal principles to the present case is Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408 (1951), although in that case there existed an independent contractor rather than a vendor-vendee relationship.

Contractual relationships of the types involved in the present and the cited cases must be carefully scrutinized for an objective determination of the factual agreement between and the legal status of the parties. The arrangement here was in good faith and apparently customary in this industry. It was not a subterfuge designed to evade the Workmen's Compensation Act. ▮▮▮ Although evasions of coverage under the act should not be permitted, courts must balance the terms of this legislation against the rights of persons to create a legitimate contractual relationship of vendor-vendee.

Affirmed.

*McGehee, C. J.,* and *Hall, Lee* and *Arrington, JJ.,* concur.