227 So.2d 470 (1969)
Napoleon BROWN
v.
L.A. PENN & SON et al.
No. 45422.
Supreme Court of Mississippi.
October 6, 1969.
Rehearing Denied November 10, 1969.
*471 James A. White, Durant, Bernard W.N. Chill, Jackson, for appellants.
Butler, Snow, O'Mara, Stevens & Cannada, Dan McCullen, Jackson, for appellees.
ETHRIDGE, Chief Justice:
This is a workmen's compensation case, involving the employee-independent contractor distinction. The question is whether appellant, Napoleon Brown, was an employee of appellee, L.A. Penn & Son, or an independent contractor. The attorney referee held that Brown was not an employee. His order was upheld by the Workmen's Compensation Commission, and the Circuit Court of Madison County affirmed.
L.A. Penn & Son (called Penn) is a partnership which engages in farming, sawmilling, and dealing in pulpwood. Penn has four salaried employees. In connection with its other business operations, Penn operates a store and service station, sells power saws, and sells parts and makes repairs to power saws and other equipment. Penn purchases pulpwood for sale to International Paper Company in Canton, and also acquires pulpwood for several other consumers; but approximately seventy-five percent of its acquisitions are for International Paper. Penn obtains pulpwood for its various customers in several ways: By purchasing from other dealers under written bulk sales contracts, a method used principally in acquisitions from land owned by International Paper Company; by buying wood from individual landowners, this method amounting to twenty-five to thirty percent of its volume; and by getting it from individual cutters and haulers, who cut wood from tracts arranged for by the hauler.
Brown, an illiterate Negro 32 years of age, was injured on November 7, 1966. He had worked for Penn as an employee several years before that date, but had departed to work in the Delta hauling wood. A year later he returned to Madison County and asked Mr. Penn whether he would purchase Brown's wood at the Canton yard, to which Penn agreed. Brown had an old truck, for which he owed another man. Penn paid Brown's creditor, whereupon Brown returned to Madison County and began cutting and hauling wood and delivering it to International Paper Company for Penn's account. That truck was wrecked, and apparently insurance paid off Brown's debt to Penn. Penn then helped Brown buy another used truck and guaranteed the payments, which Penn deducted from Brown's pay and sent to the finance company.
Fifteen to twenty haulers cut and hauled wood for Penn's account. Penn paid for some small repairs to his haulers' trucks, and when parts were needed, Penn bought them at a discount from a dealer and sold them to his workers with a limited mark-up of ten percent, allowing them to benefit from the discount. Penn would occasionally arrange financing and guarantee payments for major repairs, and sometimes the bills were sent directly to Penn. Brown and other haulers purchased some of their power saws from Penn, and had use of its repair shop. Penn also operated a grocery store used by the haulers and others and deducted the amount of their purchases from their weekly pay for hauling. Brown, at various times, would buy gasoline, groceries, clothing, and other items from Penn; and on one occasion he purchased a power saw. Brown also had minor repairs made on his truck at Penn's repair shop. When major repairs were needed, Brown would take it to a Chevrolet dealership in Canton, which would bill him for the work; and Brown would make payments through Penn's office.
Almost every week in the year preceding the accident, Penn paid or settled with *472 Brown on Fridays for the wood cut and hauled by him for the account of Penn for the preceding week. He was paid on a unit or cord basis. Penn also deducted from these payments a portion or all of Brown's gasoline, grocery, and clothing bills, and a portion of the payment owed by Brown to the finance company on his truck or truck repair bill.
The process of settlement following Brown's delivery of a load of logs involved International Paper Company giving him a ticket indicating the amount of the haul and the amount he was to be paid for it. Brown usually waited until Friday or Saturday to cash in all his tickets, but he was not obligated to do so. Generally Brown and the other haulers could make deliveries at any time, but occasionally they had to meet a deadline.
Penn testified that on occasions a landowner would be unhappy with the cutting method used by Brown and others and with the condition in which the premises were left. When this occurred, Penn would often require the hauler to clean up the land. Penn's annual volume of business was about $750,000. He bought wood from fifteen to twenty different haulers. Penn helped finance the trucks and repairs to them, and on many occasions the purchase of saws from him. He financed the purchase of groceries from the company store, and usually deducted this from the amount owed the haulers. Each day the haulers would be advised, either orally or by a notice on a bulletin board, of the type of wood which Penn was buying for its own account to sell to International Paper. Although Penn sold wood to other dealers, seventy-five percent of its sales were to International, which settled its account weekly. Approximately twenty-five percent of the wood sold to International by Penn was bought by Penn directly from the landowner, and the remaining seventy-five percent was bought from the haulers.
Penn did not withhold social security or income tax from payments to Brown. Where Brown "bought" the stumpage, he frequently asked Penn to withhold the stumpage from the payment to him. That amount would be deducted and paid in a separate check to the landowner, which Brown would deliver to the landowner or Penn would hold for the landowner to pick up. All of the wood scale tickets identified the shipper as Penn, the stumpage owner as the hauler, and the tract owner as the landowner from whose property the wood had been cut, regardless of whether Penn made the initial contract and purchased the wood from the landowner, or whether the hauler made the contact and delivered the wood to the Penn yard. Brown had no written contract with Penn and either party could terminate their working agreement at any time.
During the twelve-month period before the accident, Penn's records reflect that $13,282.39 was paid to Brown, based on the total amount of cordage which he hauled. However, the amount actually paid to Brown over a fifteen-month period was $8,141.40. Total payments to owners on stumpage cut and hauled by Brown was $3,418.59. Penn explained these variations by stating that the unitemized deductions from Brown's checks included payments on his truck, his gasoline account, and grocery bills for the two men working with him, which Brown authorized to be deducted from his paycheck.
Penn testified that Brown was one of the best pulpwood cutters that he had ever seen; that a "pretty high percentage" or "great majority" of Brown's cutting was on land for which Penn had arranged; and that between eighty to ninety percent of the stumpage which Brown cut was from land under direct contract to Penn.
Brown hired the two men who worked with or for him, paid their wages, deducted their social security, and had the right to dismiss them.
As to the circumstances surrounding the accident, Brown testified that Hutchison, an employee of Penn, had told him that *473 Willie Bennett might have timber available for cutting. Hutchison denied this. The week prior to the accident on November 7, 1966, Brown had cut timber on the Bennett tract and had hauled the wood to International for Penn. Penn had given him a stumpage check therefor, payable to Bennett, which Brown had delivered. On the morning of November 7, before going to the Bennett tract, Brown stopped by the Penn yard to get gas and oil, in accord with his practice. He then went to Bennett's tract to continue the work he had been doing the previous week. There, Bennett told him what to cut. As he was cutting the first load, a tree fell on him, causing severe injuries and total and permanent disability. Brown said that the wood he was cutting when injured was also to be delivered to International for Penn's account. After the accident, one of the other haulers for Penn finished cutting the Bennett timber and delivered it to International for the Penn account. Penn issued a stumpage check to Bennett for that timber also. Mr. Penn testified that after the accident at Brown's request, he located a buyer for his truck, who was another one of the haulers.
In an effort to show that Brown hauled for other dealers and thus was an independent contractor, Penn introduced two checks payable to Brown for hauling logs. One of these was from Bain, a competitor of Penn, dated November 3, 1966, four days before the accident. The other was from Canton Casket Company, dated November 4, 1966. In explanation, Brown said that the Bain check represented payment for partially burned wood which he had hauled to Penn's yard. When Penn and International would not accept it, Hutchison told him to take the wood to Bain. Hutchison denied this. However, Shine, one of the men working with Brown, corroborated Brown's testimony. As to the delivery of logs to Canton Casket Company, Brown explained that they had been cut by Stokes, and since Stokes' truck was disabled, he carried them to the Casket Company for Stokes.
Affirming the order of the attorney referee, the Commission held that Brown had made his own arrangements with Bennett to cut the timber, and that Penn had no knowledge of this arrangement and exerted no control over claimant regarding it. The Commission stated that it had no doubt that during certain times of the year before claimant's injury, claimant and his employees were employees of Penn. However, it held that at other times, claimant was not an employee of Penn and that on the particular day in question, he was not an employee, since he had personally arranged with Bennett to cut the latter's timber. Thus, at the particular time of injury, the Commission concluded that claimant was a vendor and Penn a vendee.
A determination of Brown's status as an employee or independent contractor cannot be made from examining solely the immediate circumstances surrounding the cutting of the Bennett tract on November 7. Consideration must be given to the entire pattern of Brown's work on behalf of Penn. Eighty to ninety percent of his cutting and hauling was done off of tracts of land from which the timber was purchased by Penn directly. He and other haulers were an integral part of the regular business of Penn. Moreover, the evidence is wholly insufficient to show that Brown, relative to the employer, furnished an independent business or professional service. Realistically, Brown was under Penn's direction and control. He and the two men working under him relied upon Penn to furnish them with most of their necessities: Penn financed the truck, a saw, gasoline for the truck, and groceries at the Penn store, at least for Brown's two employees. Because of the financial arrangements respecting Brown's truck and other operations, Brown more or less had to deliver his loads to Penn. If he did not, he would receive no credit for his truck payments, and Penn naturally would not continue making them unless Brown earned the money to do so.
*474 Furthermore, during the week preceding the accident, the timber on the Bennett tract was cut and hauled by Brown to International for Penn's account. The logs being cut on the Bennett tract on the day of the accident were subsequently cut and removed by another one of Penn's haulers, who delivered them to International for the account of Penn.
The right of control rather than the actual exercise of control is a primary test of whether a person is an independent contractor or employee. In the instant case there is direct evidence of the right to control, the express or implied exercise of that right, the method of payment, the furnishing of equipment by financing its purchase, and the right to fire. In short, Brown was not truly independent, performing an independent business service, but devoted all or most of his time to Penn. Moreover, his work for Penn was an integral part of Penn's business process. Brown's work and that of other haulers who operated similarly to him had become enmeshed with and were an integral part of their employer's business.
These considerations have been examined in detail in other cases dealing with similar and related employments. This case is a stronger one for the employment relationship than was Boyd v. Crosby Lumber & Manufacturing Company, 250 Miss. 433, 166 So.2d 106 (1964). See, generally, Empire Home Builders v. Guthrie, 187 So.2d 17 (Miss. 1966); Brown v. E.L. Bruce Co., 253 Miss. 1, 175 So.2d 151 (1965); White Top & Safeway Cab Co. v. Wright, 251 Miss. 830, 171 So.2d 510 (1965); Wade v. Traxler Gravel Co., 232 Miss. 592, 100 So.2d 103 (1958); Sones v. Southern Lbr. Co., 215 Miss. 148, 60 So.2d 582 (1952); 1A Larson, Workmen's Compensation Law §§ 45-45.22 (1967); Dunn, Mississippi Workmen's Compensation §§ 131-134 (2d ed. 1967). Nelson v. Slay, 216 Miss. 640, 63 So.2d 46 (1953), relied upon by appellees, involved a vendor-vendee relationship. The facts in Nelson concerning the right to control and integration with the business of the vendee are essentially different from those here.
In the instant case the facts are not in substantial conflict. Thus the substantial evidence rule cannot determine our decision. This Court's duty is to examine the facts in the light of the statute and the decisions interpreting it. Central Electric Power Ass'n v. Hicks, 236 Miss. 378, 110 So.2d 351, 112 So.2d 230 (1959). Both under the control and relative nature of the work tests, Brown was an employee of Penn within the terms of the workmen's compensation act. The question is a realistic one: Was Brown an independent contractor in fact, or in practical effect did Penn have the right to control him? That question must be answered in the affirmative. Further, Brown's work was not an independent business. He and the other fifteen to twenty haulers who might be similarly situated were integral parts of Penn's production and marketing process.
Accordingly, the judgment of the circuit court, affirming the order of the Workmen's Compensation Commission, is reversed; the order of the Commission is set aside; judgment is rendered here awarding workmen's compensation benefits to appellant; and the cause is remanded to the Commission for administration of the award.
Reversed, judgment rendered here for appellant, and cause remanded to Workmen's Compensation Commission.
RODGERS, JONES, BRADY and INZER, JJ., concur.