EMPLOYERS INSURANCE COMPANY OF ALABAMA, et al. *v.* DEAN

No. 40055 April 2, 1956 86 So. 2d 307

502

*Welch, Gibbes & Graves,* Laurel; *Hamilton, Denniston, Butler & Riddick,* Mobile, Alabama, for appellants.

504

*O. F. & J. O. Moss,* Lucedale, for appellee.

Roberds, P. J.

On February 23, 1954, Dean, the appellee, was severely injured while unloading lumber from a truck upon the lumber yards of Fruitdale Lumber Company at Prichard, Alabama. He filed a claim against Fruitdale and its insurance carrier for compensation for his injuries under the Mississippi Workmen's Compensation Law. Chapter 354, General Laws of Miss., 1948, as amended by Chapter 412, General Laws of Miss. 1950.

Fruitdale and its carrier denied liability. They said that Dean, at the time of his injury, was not an employee of Fruitdale; that he was a servant of H. H. Connell, who, in his relation to Fruitdale, was an independent contractor. The attorney-referee, the full commission, and the circuit court found that Connell was not an independent contractor, but that, on the other hand, Dean was an employee of Fruitdale within the meaning of the Workmen's Compensation Act, and that, therefore, Dean was entitled to compensation from Fruitdale. From the judgment of the circuit court, this appeal was taken by Fruitdale and its carrier.

Counsel say in their briefs that the only question now presented to us on this appeal is whether or

not the findings of the lower tribunals should, or should not, be sustained. That depends upon whether the lower tribunals had substantial evidence to support their findings and conclusions, or, stating the test differently, whether or not such findings and conclusions are against the great weight of the evidence. Sones v. Southern Lumber Company, et al., 215 Miss. 148, 60 So. 2d 582.

In Kisner v. Jackson, 159 Miss. 424, 132 So. 90, this Court specified certain factors to be considered in determining this question: ''There are several tests to be applied, the weight of each, and whether much or little, rising and falling in the scale as it may or may not be counterbalanced by one or more of the remaining tests, present in the particular case in hand. For this reason these tests cannot be stated in any precise order of importance, but they are as follows: Whether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; and whether he is obliged to pay the wages of said employees. These are the tests, as we think, and any other, if differently stated, may be brought within one of those above briefly set out.'' See Sones v. Southern Lumber Company, supra. In the recent case of Miss. Employment Security Commission v.

Plumbing Wholesale Co., 219 Miss. 724, 60 So. 2d 814, this Court further enumerated the following elements to be considered in determining the question under consideration:

(a) The extent of the control which the master has a right to exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the skill required in the particular occupation; (d) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the person is employed; (f) the method of payment; and (g) whether or not the work is a part of the regular business of the employer. Factors, other than those above detailed, may be involved under the intricate, complex commercial relations existing today. Perhaps the most important single fact in determing the relations is the right, or power, of control one has or exercises over the supposed servant or employee.

Fruitdale says it had an oral agreement with H. H. Connell under which Connell was to haul from the George County mill to the principal mill at Prichard the lumber which was manufactured at the George County mill, for which service Connell was to be paid by Fruitdale six dollars per thousand feet, Connell to furnish his own vehicles, equipment, and labor for doing the work, with the exclusive right and power to hire, control and discharge such labor, and that Connell orally contracted with Dean, the appellee-claimant, to thus haul the said lumber, and that Connell furnished to Dean a truck for such transportation of the lumber, and had exclusive control over Dean while Dean was doing the work, and that Dean was such employee of Connell at the time of his injury. On the other hand, Dean says he was, in ultimate effect, an employee of Fruitdale within the purport of the Workmen's Compensation Act.

With the foregoing legal rules and tests and contentions in mind, we will undertake to briefly state, in substance, the pertinent testimony which was before the lower tribunals as we glean it from the record before us.

H. H. Connell testified that he was forty-seven years of age and lived in Mobile; that he made the oral agreement with Fruitdale to transport lumber from George County mill to Prichard, and Fruitdale was to pay him six dollars per thousand feet for the lumber so transported, he furnishing all the means and paying all expenses of transportation; that the agreement covered no specific time; that he orally agreed with Dean to transport the lumber at five dollars per thousand feet, he furnishing to Dean a truck for that purpose; that when he engaged Dean to do this work Dean was working for Fruitdale; and that at first Dean alone unloaded his truck at destination but later he furnished Dean a helper in the unloading on the yards at Prichard. This helper used a machine called a logger's dream, which was the property of Fruitdale, and that he, Connell, paid his helper fifty cents a load but paid nothing for the use of the logger's dream. Connell said Dean selected his own route of travel in transporting the lumber, and that Dean had instructions to call him or Mrs. Connell in case of truck trouble, but if he couldn't get one of them, then to call Fruitdale. He kept social security records as an employer of Dean and furnished to Dean a form for making income tax reports, but apparently no income tax report was made by Dean, his income not being sufficient to require such report. At one time he, Connell, purchased a sick and accident insurance policy for Dean payable to Mrs. Dean, but that had lapsed. On direct examination, he said that neither Lindsey nor Campbell (composing the partnership of Fruitdale Lumber Company) had any power to direct the work of Dean or discharge him; and that he only had that right and power.

However, on cross-examination he admitted that the payrolls for the three mill plants were prepared at Prichard, which was the largest plant and covered some seven acres of ground; and that the payrolls for the George County mill were transported to that mill each Friday by Dean. He also admitted that at various times Dean had transported from Mobile and from the Prichard plant to the George County mill various and sundry articles for maintenance, repairs and use at the George County mill. This included a diesel engine which was installed and used at the George County mill. All of this was done without extra charge and at the request of one of the partners in Fruitdale. With reference to the control that Fruitdale had over him, he said: "* * * they had control of me to a certain extent. Just a verbal agreement was all." Q. "They told you what to do on everything you done for them. Isn't that correct?" A. "That's right." He said Lindsey and Campbell left to him the matter of hiring and firing Dean. He admitted that, at the request of Fruitdale, Dean had transported lumber from the George County mill to places other than Prichard—for instance, to Moss Point, Gulfport, Pensacola, the wharves of Mobile and other points. He said he had been employed by Fruitdale since 1947 in various types of work, from log scaler to superintendent; that when the injury to Dean occurred and when the trial took place he was employed by Fruitdale as superintendent of the Cottage Hill mill; and that during the time Dean was supposed to be working for him, that he, Dean, at the request of Lindsey, had hauled as much as ten truck loads of lumber from the Cottage Hill plant to Pensacola and other places.

J. H. Dean testified that he lived in George County. He was thirty-six years of age. Before his arrangement with Connell, he had been in the employ of Fruitdale for some four or five years. He said at first he was "Just a flunky boy"; later he performed various duties, in-

cluding the driving of a truck. As a mill worker, he was paid $30 per month, and as a truck driver, he was paid $73 per week by Fruitdale. He had been driving a truck for Fruitdale for three and a half years. He had hauled lumber from the George County mill to the Prichard plant. Lindsey ran the outside operations; Campbell kept the books and records and was in charge of the inside work. He made an arrangement with Connell to haul lumber from the George County mill to the Prichard mill. It was an oral agreement. Connell paid him. He said that while he had his arrangement with Connell, yet Lindsey had the right to, and did, largely direct him as to what to do. He said he hauled "any place they would tell me." He also said that while his arrangement with Connell was to haul from George County to the Prichard mill, yet he, at the direction of Lindsey, or his superintendent, hauled from the George County plant to Gulfport, Pensacola, Moss Point and other places; and that he also, at the direction of Lindsey, or his superintendent, hauled from the Cottage Hill plant to various points, including delivery to seaports for sea transportation. He said that Connell was a go-between and that Lindsey was the boss. "Whatever he said went." He admitted Connell hired him and paid him by the week. He said Lindsey refused to permit him to let another man ride on the truck, saying if the rider was injured Fruitdale would be liable. Lindsey told him if he had truck trouble to call the Prichard office of Fruitdale. Sometimes, when trouble occurred, he called Connell, and if he were not available he talked with Mrs. Connell, or with Fruitdale. Truck operating expenses were charged to Connell. On February 23, 1954, he transported a truck load of lumber from the George County mill to Prichard. Abe Lott used the logger's dream to aid in the unloading. It was then that the lumber fell upon and injured him. He thinks Lott was paid by Connell. As to how and when he should work, he said: "* * * Mr.

Lindsey would tell me when to come in and have it loaded and tell me where to go. How to pick them up." Q. "What statement would he make?" A. "Maybe I would be there this afternoon and he would say, bring it in in the morning and to take this, wherever it was to go." If he needed something and didn't have it, he would say: "I need some two inch, bring it in. He told me many a time have this lumber in at 6:30 in the morning so he would have something for his men to do." He said that at one time Connell carried a sick benefit and accident policy for him, which had lapsed. Connell kept his social security records. The witness made no income tax reports. An important fact, bearing upon the question under consideration, was that Dean and family occupied a house belonging to Fruitdale and located at their George County mill. Dean paid nothing for the use of the house. He thought a reasonable rental for the house would have been thirty dollars per month. He said that on each Friday he brought from Prichard the payrolls, pay envelopes, checks and money for weekly pay-offs to the employees at the George County mill without any extra pay. He said that in addition to his hauling between the George County mill and the Prichard plant he also, under the direction of Lindsey or his superintendent, hauled from the George County plant to Gulfport, Moss Point, Pensacola and other places, some of which lumber, so hauled, being loaded onto ships for sea transportation. He further said he hauled to the George County plant from Mobile and the Prichard plant various articles for use at the George County plant. This included the diesel engine mentioned above. He got no extra pay for his services in transporting these extra articles. He also hauled some ten truck-loads of lumber from the Cottage Hill plant to various places.

His contract was for no specified time and it was his obligation to haul as often as necessary to keep the traps at the George County mill sufficiently clear of lumber

so as not to interfere with the manufacture of the logs into lumber.

T. W. Cornett testified that he is a brother-in-law of Dean. When Dean was injured, Cornett was operating the George County mill under an arrangement with Fruitdale that he would be paid a certain amount per thousand feet of the lumber cut by Cornett from logs of Fruitdale. Cornett said he hired, paid and directed his own labor, but he also testified that Fruitdale had control. "I obeyed their orders. Carried out their orders." Q. "What they told you to do, you did?" A. "To the best of my knowledge." Fruitdale advanced money for the Cornett operations. Fruitdale made out the weekly payrolls for Cornett, at its Prichard mill, and Dean transported them each Friday to the George County plant. In March, 1951, Dean went to work for Connell. Dean was the only one who hauled lumber from the George County plant except that sometimes the company truck would haul some. At the time Dean was injured, Connell was superintendent of the mill at Cottage Hill. He thought that Dean was working for Connell but also said that if Lindsey directed Dean to go to some certain place Dean would have to do so to keep his job. Connell cautioned Dean about permitting anyone to ride on the truck. He never heard Lindsey direct Dean as to what to do or what not to do. However, he was of opinion that Dean would have complied with any direction or request which Lindsey or Campbell might have given about Dean's work. He admitted that Dean brought the payrolls from Prichard, and other articles and equipment needed at the George County mill, including the diesel motor.

Mr. George Lindsey testified that he was a partner with Campbell in the ownership and operation of the three sawmills; and that he had an oral understanding with Connell to haul the lumber from the George County mill to the Prichard plant, and "bring back" any parts

the George County mill might need. Connell was to be paid $6 per thousand feet of lumber. He did not hire Dean. He paid none of the upkeep or expenses incurred in such hauling. Fruitdale did not hire Dean, and had no authority to direct his activities—had no control over him. He admits Dean made a few trips to Pensacola, Gulfport and other places, but he says these were covered by the arrangement with Connell. He said the George County and Cottage Hill mills were only about four miles apart. He said the trips made by Dean to places other than Prichard would be handled in this manner: The George County mill would be out of logs or broken down, and Connell would want something else to do "and we would let him make loads to Pensacola or Gulfport. Wherever we had a load going." He was asked whether he or Connell directed Dean to make the extra trips to places other than to Prichard, and he replied: "It might be Dean would come in and I would ask him if he would like to make a load to Pensacola and he would say 'yes', because naturally he was paid by the load and the more loads he made the more money he got." He thinks Dean made about twelve loads from Cottage Hill mill to various points other than Prichard. He says he could have discharged Connell as superintendent of the Cottage Hill mill but not as an independent contractor hauling lumber from George County to Prichard. He said the truck used by Dean belonged to Connell, rather, it did not belong to Fruitdale, but he also said that Fruitdale had included that truck in a fleet policy against liability. He said Connell paid the premium on the truck. That was the reason he told Dean not to permit anyone to ride on the truck.

Mr. Charles T. Campbell testified that he kept the books of Fruitdale Lumber Company and that Lindsey looked after the outside activities. Fruitdale made the arrangement with Connell to haul logs from George County mill to the Prichard mill. Connell was paid at

the end of the week. Connell paid Dean. Fruitdale did not hire Dean. Connell had been working for Fruitdale for a number of years. Connell's weekly wage with Fruitdale was $75. Connell served in a dual capacity with Fruitdale—as superintendent at the Cottage Hill mill he was an employee and a servant, and as a hauler of logs from George County mill to Prichard he was an independent contractor.

Mr. R. J. Green was placed upon the stand in rebuttal by claimant Dean. His testimony is of no practical value.

Claimant Dean also placed upon the stand in rebuttal Hubert Berry. He was twenty-nine years of age and lived near the George County mill. He said Connell drove the hauling truck but got hurt and then, as he understands, Connell made an arrangement with Dean to do the hauling. However, he said Connell scaled logs three months as an employee of Fruitdale at the George County Mill after Dean started his truck-hauling operations.

 ██ From all of this rather intricate, interrelated and interlocking relationship the lower tribunals adjudged that Connell was not independent of Fruitdale in the hauling of this lumber. Can we say that conclusion was manifestly wrong? We do not think so. We do not feel it is necessary to undertake a detailed analysis of the situation. We attach much importance to two undisputed situations. One is the underlying structure disclosing the relations between these parties before this hauling arrangement began. Fruitdale was a large operator,—it owned and operated three large sawmill plants. It, of course, from time to time had many employees. Both of the parties here concerned, Connell and Dean, had been employees of Fruitdale in different capacities for many years, during which time Fruitdale was master and Dean and Connell were servants. Under the hauling arrangement, the work was being done for Fruit-

dale. That concern furnished all of the money. All parties looked to it for pay and wages. It advanced all money for all operations. It is extremely difficult to conclude with any confidence that either Dean or Connell could have disobeyed any order or instructions Fruitdale might have given.

The other undisputed fact of much importance, in our opinion, is that Connell was superintendent of the mill at Cottage Hill at the time Dean was doing this hauling and at the time Dean was injured. Appellants contend Fruitdale could have discharged him as superintendent but not as an independent contractor. They say, too, that Connell could have controlled and directed Dean, as to hauling lumber from Cottage Hill mill, in a dual capacity, as superintendent of the plant and a servant of Fruitdale, and as a contractor with Dean, independent of any control by Fruitdale. In Carroll v. Laughlin and Sons, et al., 220 Miss. 535, 71 So. 2d 461, we said: ''Where there exists a dual relationship of employee and contractor, and the authority and duties of the employee embrace the same subject matter as the contract, the court will not attempt a theoretical determination of whose control is being exercised in the performance of the contract. The right of control of the employer and independency of the contractor cannot coexist.'' We realize that this principle applies only to the lumber which was hauled by Dean from the Cottage Hill mill, of which Connell was superintendent, but the fact of such hauling, and the existence of the announced principle, weigh heavily upon the question of whether Dean was an independent contractor.

In addition to the foregoing two important facts, the Commission had before it the testimony tending to establish that (a) Dean was directed by Mr. Lindsey to haul to various destinations other than Prichard; (b) that Lindsey gave Dean instructions as to the size of lumber to be hauled on particular occasions; (c) that

Lindsey gave orders that no riders be permitted on the truck for fear of incurring liability; (d) that Dean was required by Fruitdale to transport payrolls, equipment and parts from Prichard to George County mill without extra pay; and (e) that Dean and his wife and children, during all of the time he was supposed to be working for Connell, were permitted by Fruitdale to occupy a house on the premises at the George County Mill without charge. The record discloses other instances of exercise of authority by Fruitdale over Dean and Connell.

It was the province of the lower tribunals, under the evidence in this record, to reconcile, weigh and accept or reject, the testimony where conflicts appear therein, and draw logical and reasonable conclusions from the facts so adjudged and accepted by them.

Upon thorough consideration of the entire record, we are not able to say the lower tribunals did not have substantial evidence to support their findings and conclusions.

Affirmed and remanded.

*Hall, Lee, Kyle* and *Holmes, JJ.*, concur.