**William R. BUTLER, Jr., d/b/a Butler Planting Company, Plaintiff,**

v.

**BUNGE CORPORATION, Third-Party-Plaintiff,**

v.

**Harold BAYLES, d/b/a Coahoma Grain Elevator, Third-Party-Defendant.**

**No. DC 6948–K.**

United States District Court,
N. D. Mississippi,
Delta Division.

June 22, 1971.

Pat D. Holcomb, William O. Luckett, Shed Hill Roberson, Clarksdale, Miss., Charles C. Jacobs, Jr., Cleveland, Miss., for plaintiff.

C. S. Tindall, Jr., Greenville, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this diversity action the plaintiff is William R. Butler, Jr. (Butler), a Mississippi citizen conducting a farming operation in Bolivar County, Mississippi, and the defendant, Bunge Corporation (Bunge), is a New York corporation engaged in buying and storage of grain in Mississippi under the trade name of River Grain Company. The suit seeks the recovery of $38,265.30, plus interest, claimed by Butler as the unpaid purchase price for his 1968 soybean crop sold and delivered in February 1969 to Coahoma Grain Elevator, a facility which Butler contends was a part of Bunge's business entity and managed by Bunge's agent, Harold Bayles (Bayles). Bunge denies that Coahoma Grain Elevator was a part of its operation or that Bayles was its agent, and asserts that it has no legal responsibility to Butler for the soybeans in suit. Bunge also entered a third-party complaint seeking recovery from Bayles of any judgment awarded against Bunge. Bayles, who was duly summoned, failed to answer or otherwise contest the issue.

The case was tried to the court without a jury in a three-day evidentiary hearing, and following submission of briefs, is ripe for decision on the merits. This Memorandum Opinion shall suffice for findings of fact and conclusions of law required by Rule 52 of F.R.Civ.P.

### I.

Bunge, one of the world's largest grain exporters, has for several years extensively engaged in the business of buying,

handling, storing and shipping soybeans, wheat and other grains grown in the Mississippi Delta. Bunge's main business office for its Greenville division of the River Grain Company is located at Greenville, where Floyd H. Blundell is general manager, John L. Everitt is office manager, and also where the company's records and bank accounts are maintained. At Greenville, Bunge has constructed on the east bank of the Mississippi River large grain-storage facilities having a capacity exceeding 1,000,000 bushels. In Bolivar County, 50 miles north of Greenville and also located on the Mississippi River, is another large Bunge-owned and operated grain facility known as Hurricane Point. This facility has a storage capacity of 1,250,-000 bushels. From these riverside elevators Bunge ships grain by barge for export to foreign markets. Bunge's supervisory employees, Jimmy Battles and Ed Battles, are in charge of the Hurricane Point facility and, like other Bunge representatives subject to Blundell's direction and control, they regularly purchase grain for Bunge's account from farmers and independent small elevators in the region.

In 1963, while the Hurricane Point facility was being constructed, Bunge also erected a small elevator at Lula, in Coahoma County, as a receiving station for grain to be transferred to Hurricane Point. This 20,000-bushel elevator, which was known as the Lula Grain Elevator, was operated by Bunge's personnel until September 1, 1966. During the summer of 1965, Bunge purchased a tract of land at Roundaway, in Coahoma County near Clarksdale, and built thereon a 24,000-bushell grain facility at a cost of $54,350.45 for land, building and equipment, for the stated purpose of increasing Bunge's purchases of grain grown in that area within convenient reach of the Hurricane Point facility. On September 1, 1965, Bayles began business operations as Coahoma Grain Elevator at the Roundaway facility under a written agreement with Bunge; a year later, on September 1, 1966, under an identical agreement with Bunge, Bayles also became the operator of the Lula Grain Elevator. Bayles was operating both grain elevators under these agreements at the time of the purchase of Butler's soybeans. The operator's agreement between Bunge and Bayles [1]

---

1. The operator's agreements for both Coahoma and Lula Grain Elevators provide in relevant part:

(1) Bunge, as owner shall:

"(a) Construct a grain elevator * * for the purpose of enabling Operator [Bayles] to receive grain for transfer to trucks or rail cars for shipment to Owner * * *

(b) Purchase from Operator for immediate delivery to Owner all grain received by the elevator at prices agreed upon by Owner and Operator at intervals during the day.

(c) Consult with Operator with respect to the establishment of prices to be paid by Operator for purchasing grain from farmers.

(d) Accept for storage at one of Owner's river elevators any grain received by Operator which the farmer would prefer to store rather than sell * * *

(e) Train Operator's personnel in their duties in purchasing grain and operating and maintaining the elevator, including

(without limitation) proper weighing and grading practices."

(2) Bayles, as Operator shall:

(a) Provision deleted.

"(b) Employ and furnish all personnel required to maintain and operate the elevator properly and efficiently.

(c) Supervise the operation of the elevator in all respects, including (without limitation) proper weighing, grading, purchasing, contract administration and customer relations.

(d) Operate and maintain the elevator in good, proper and safe working order and condition.

(e) Keep in effect, for the benefit of Owner and Operator, policies of insurance of the kinds shown below in such amounts as may be required by Owner from time to time." (Here follow specific provisions regarding Workmen's Compensation and Employers Liability Insurance, and Comprehensive General Liability Insurance, with specified limits and naming Bunge as an additional insured thereunder.)

relating to Coahoma Grain Elevator concerned three different aspects:

(1) Bunge's purchase from Bayles of grain received at the Roundaway elevator and manner of arriving at prices; (2) Bayles' operation of the Roundaway elevator and the charges payable by him to Bunge for the facility's use based upon the quantity of grain received at that elevator; and (3) Bunge's furnishing storage at one of its river elevators for farmer-owned grain handled by Bayles which the grower preferred to store rather than to sell and Bayles' compensation for soliciting such storage.

In January 1966 Bunge obtained an exemption from ad valorem taxation on the Roundaway facility by stating in an application addressed to the Coahoma County Board of Supervisors that it "is now engaged in the operation of a grain elevator at Roundaway * * * which facilities are in addition to applicant's other facilities" and "constitute a part of applicant's business and new enterprise." This application was prepared and filed by Bunge's attorneys, notwithstanding the fact that Blundell had advised them, by handwritten note, "this plant is leased to an independent operator."

The activity in the several areas contemplated by the operator's agreement is shown by evidence establishing the following facts:

(3) Bayles as Operator shall:
"(a) * * * pay Owner the following charges for grain received at the elevator:

| Volume | Charge |
|---|---|
| first 100,000 bushels | 3¢ per bushel |
| next 100,000 bushels | 2¢ per bushel |
| all over 200,000 bushels | 1¢ per bushel |

On the 10th day of each month during the term hereof, Operator shall send Owner a statement setting forth the number of bushels of each kind of grain received at the elevator during the preceding month, the charges due Owner with respect thereto, and a check drawn to the order of Owner for the amount due."

(b) Bunge as Owner shall: "* * * As compensation for soliciting such storage,

## (a) Grain dealings between Bunge and Bayles.

Bayles, at the inception of the agreement, was already experienced in the grain elevator business, and he operated the Coahoma Grain Elevator continuously for 3½ years prior to the events leading to the present controversy. During active seasons, Bayles checked regularly, very often several times daily, with Bunge personnel, chiefly at its Greenville office, to determine price quotations, f. o. b. Hurricane Point, on the basis of which he made purchase offers to farmers solicited by him. The transactions between Bayles and the customers always provided for the cost of transporting the grain to Coahoma Grain Elevator or to Hurricane Point, as might be agreed, an expense borne sometimes by the seller and at other times by Bayles. Bayles' margin of gross profit, or compensation, on any quantity of grain handled was the difference between Bunge's price to him and his price to the farmer. This margin was not fixed but varied with individual trades.

Bayles selected the farmers he would solicit, and entered into grain transactions, on spot basis or booking contract, at prices and on terms agreed upon between him and the farmer. Bunge's personnel, however, consulted regularly with Bayles about the price to be offered farmers and were aware of market prices available to farmers in the area.

* * * pay Operator ¼ cent per bushel per month * * *", for grain accepted for storage at one of Owner's river elevators in accordance with ¶ 1(d) above, and payable when Owner receives payment of the storage charge from the farmer.

(4) The grain elevator and all equipment and supplies constructed or furnished by Bunge shall remain its property.

(5) The term of the agreement is to extend for one year and automatically renewed for successive periods of one year each in the absence of written notice by either party of intention to terminate or renegotiate the agreement at least 60 days prior to its expiration.

Bunge customarily settled with Bayles immediately upon delivery of grain at Hurricane Point, thereby supplying Bayles with funds to pay his customers. Bunge imposed no control whatever upon the application of these proceeds which Bayles placed in an account in a bank at Clarksdale in the name of Coahoma Grain Elevator. Bayles alone had authority to draw upon this account, and Bunge had no connection therewith. Bayles settled with the grain growers always by issuing to them checks signed by him and drawn against the Coahoma Grain Elevator account. In the general course of its dealings, Bunge was aware that Bayles had to receive payment for the grain before he could settle with the farmers.

During the period under review, Bayles delivered to Bunge 97% of the soybeans and other grain acquired by him from farmers; these transactions, which represented large values, accounted for no less than one-third of the total annual volume handled by Bunge at the Hurricane Point facility. The remaining 3% of the grain Bayles sold to three other large buyers, Planters Manufacturing Company, Cargill Grain Company and Archer-Daniels-Midland, but only after he obtained permission from Blundell, Bunge's general manager, to do so. On these occasions Bunge was either not buying grain or not offering prices competitive with the domestic market. Bayles paid Bunge no part of the proceeds derived from such sales.

In trading with the public, Bunge purchased grain either on a "spot" basis calling for payment of the daily quoted price upon immediate delivery, or on contracts calling for delivery at a later date at a fixed price, or on basis contracts providing for delivery with price to be fixed by seller at a later date. These modes of purchase are customary in the grain buying business, and Bunge made them available to Bayles. Bunge had a dual price policy whereby one price was quoted farmers directly trading with it and another was extended to Bunge's small elevator customers. Bayles was quoted the better price given only to the elevator customers. Also, as per custom, Bunge made advances to its sellers against grain in storage and, in the case of accounts it deemed more reliable, against grain under contract for future delivery.

Bunge frequently made sizeable advances to Bayles, not only on grain stored in his name at Hurricane Point but also against contracts made for future delivery. For example, Bayles' account was quite active through the period of February 1–March 24, 1969, with Bunge's advances reaching a high of $55,000 on February 27. During this critical period Bayles executed three soybean contracts with Bunge, i. e., 5,000 bushels on February 4 at $2.625, 35,000 bushels on February 7 at $2.625 and 16,000 bushels on February 26 at $2.6275, each specifying "prompt" delivery at Hurricane Point. Against these contracts Bayles delivered an aggregate of 54,795.35 bushels, from the value of which Bunge recovered current advances totaling $90,750 and paid Bayles the balance or $52,333.51. Bunge never received from Bayles all the grain needed to complete his contracts. In its prior dealings, Bunge had encountered no difficulty with Bayles repaying advances or in carrying out his grain contracts.

### (b) The operation by Bayles of Coahoma Grain Elevator

Upon the execution of the operator's agreement, Bayles in September 1965 took possession of Bunge's grain facility at Roundaway, obtained a $300 advance from Bunge, and commenced operating as Coahoma Grain Elevator. He thereafter employed the necessary help at the elevator, fixing their wages and hours of work, and paid all salaries and other operating expenses, including cost for transporting grain to Hurricane Point. Each month he calculated the amount of grain he handled, both the quantity sold to Bunge and that sold to other buyers, and sent Bunge checks for the monthly charges fixed by the contract for use of the elevator at Roundaway. These remittances included all grain handled by Bayles, whether it went directly from the

farm to Hurricane Point, or to Coahoma Grain Elevator, or to some other destination. Treating them as "rental" payments, Bunge accepted these checks without question as to the basis of calculation. All operating expenses were paid out of Bayles' bank account maintained in the name of Coahoma Grain Elevator. In his day-to-day operation Bayles' chief contact with Bunge was by telephone conversations with Blundell; these occurred many times daily during the buying season and, as stated, dealt principally with price quotations. On occasion Blundell would personally inspect the premises of Coahoma Grain Elevator and instruct Bayles to keep it clean, but in a practical sense Bayles had a free hand in running the elevator and supervising and directing the elevator employees. While scale tickets used at Coahoma Grain Elevator were printed in the same form as those at Hurricane Point, Bayles always accepted Hurricane Point's weights and grades in settling with Bunge. In dealing with farmers, Bayles often used the weights and grades as determined at Coahoma Grain Elevator, yet he sometimes settled on farmers' weights and grades.

The insurance required by the operator's agreement was obtained through New York insurance brokers who handled Bunge's insurance program. A comprehensive liability insurance policy with the required limits, was issued by this firm directly to Bayles covering the Roundaway and Lula operations, and Bunge was named as an additional insured. The same insurance brokers wrote Workmen's Compensation insurance for Bayles at both locations. In addition, Bunge carried property insurance, including coverage on grain stocks, on the Coahoma and Lula Grain Elevators. Bunge always paid the entire insurance premiums, and charged Bayles with the portion allocable to his account.

(c) *Bunge's furnishing of storage facilities.*

The business sign on the premises of Coahoma Grain Elevator advertised that grain storage was available. It was commonly understood that this referred to Hurricane Point, which was the Bunge riverside elevator nearest Roundaway. Contrary to the operator's agreement, Bayles did not solicit farmers to use this storage facility, nor did he receive any compensation therefor from Bunge. Instead, Bayles extensively used Hurricane Point for storing large volumes of grain in his own name, as a basis for immediate financing from, and ultimate disposition to, Bunge. Bunge charged Bayles the regular storage rates for all grain stored by him at Hurricane Point. In similar fashion, grain which Bayles received at Lula Grain Elevator was shipped and stored at Hurricane Point in Bayles' name. In general, Bayles' operation at Lula Grain Elevator was the same as at Coahoma Grain Elevator. One notable difference existed on the premises of the Lula Grain Elevator, viz: that a Bunge sign was displayed on the elevator, it appearing that this sign was first mounted when the facility was built and was not removed when Bayles took possession on September 1, 1966, under the operating agreement applicable to the Lula Grain Elevator.

## EVENTS LEADING DIRECTLY TO THE PRESENT CONTROVERSY

In 1968 Butler had his first business dealings with Bayles. At that time he sold his entire soybean crop grown in 1967 to Coahoma Grain Elevator, and he negotiated the sale with Bayles, receiving payment by the check of Coahoma Grain Elevator which was signed by Bayles. Butler did not immediately sell his 1968 bean crop upon harvest but carried it over into 1969. At all pertinent times Butler knew that the Battles directly represented Bunge in purchasing soybeans, that they could be reached at Hurricane Point, and that they wanted to purchase his beans. About February 1, 1969, one of the Battles, acting for Bunge, quoted Butler by telephone a price of $2.60 per bushel. On the same day Bayles contacted Butler, also by telephone, and offered him $2.615 per

bushel, stating that he was "giving up part of his commission".

Butler accepted Bayles' offer on the understanding that he, Butler, would bear the expense of hauling the soybeans to Hurricane Point. Butler's crop consisted of about 15,000 bushels. Later Butler and Bayles modified their agreement whereby about 10,000 bushels of Butler's beans having high moisture content would be shipped directly to Coahoma Grain Elevator for blending with dry beans, in consideration for which Bayles agreed to transport that quantity to Hurricane Point at his cost. The remaining beans, or approximately 5,000 bushels were, as originally agreed, to be hauled directly to Hurricane Point at Butler's expense. Between the dates of February 4 and February 14 Butler shipped his bean crop to Hurricane Point and Coahoma Grain Elevator in accordance with this understanding, and the evidence supports a finding that the entire crop was received at Hurricane Point. Bayles prepared a settlement sheet for Butler and issued two checks against the account of Coahoma Grain Elevator and signed by Bayles.[2] One check dated February 26 was payable to Commodity Credit Corporation for $36,558.48 to discharge a mortgage debt in that amount against the beans; the other check dated February 25 was payable to Butler for $1,706.82 as the balance of the sale price. Both checks, when presented for payment, were dishonored for insufficient funds. Upon being notified, Butler first contacted Bayles and demanded payment from him. On March 26 Butler consulted an attorney and then notified Bunge that Bayles had failed to pay the checks and that it was handling mortgaged beans.

On March 27 Bayles sold his interest in Lula Grain Elevator to an employee, T. L. Brunt, and ceased operating that facility. On the same day he executed his note to Bunge for $7,811.23 to cover unpaid balances for rentals and insurance premiums incurred in operating the Lula and Coahoma Grain Elevators. Thereafter Bunge had no further grain dealings with Bayles or Coahoma Grain Elevator, even though wheat transactions customarily took place in the spring of each year, and on September 1, 1969, Bunge formally terminated the operator's agreement.

Commodity Credit Corporation made demand upon Butler for the mortgage debt on the soybeans, and Butler, having paid the debt with his own funds, now sues Bunge for the full sale price of the beans in controversy. The evidence indicates that various other farmers in the area who dealt with Bayles in the sale of soybeans during February and March 1969 are making like demands against Bunge.

## II.

Plaintiff makes three contentions: first, that Bayles had actual authority to purchase grain as Bunge's agent; second, in the absence of actual authority, Bayles possessed apparent or ostensible authority to bind Bunge as principal; and third, irrespective of the rules of agency, Bunge was not a buyer of goods in the ordinary course of business under the Mississippi Uniform Commercial Code[3] since it received plaintiff's soybeans when they were subject to an un-

---

**2.** Butler testified that he misplaced, and could not produce, Bayles' settlement sheet for a gross price of $38,265.30. At $2.615 per bushel, this would mean an actual receipt of 14,633 bushels.

**3.** MUCC § 41A:1–201(9)
"Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interests of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.
MUCC § 41A:9–307(1)

satisfied mortgage in favor of Commodity Credit Corporation and applied their value to the payment of a pre-existing debt owed to Bunge by Bayles.

Vigorously taking issue with each contention advanced by plaintiff, Bunge asserts that Bayles was not its agent but an independent contractor in purchasing grain as Coahoma Grain Elevator and Butler knowingly dealt with him on that basis. Bunge further contends, inter alia, that absent a finding of agency, it is entitled to the protection accorded by state law to a buyer of goods in the ordinary course of business.

We agree that the issue of agency is determinative because, if Bayles is held not to be defendant's agent in buying grain, the evidence affirmatively discloses that Bunge paid him for all grain transactions in suit, by either cash at time of delivery or cash advances under preexisting contracts for sale; and Bayles was not a person engaged in farming operations. Additionally, the evidence does not show that Bunge, at the time of receiving plaintiff's soybeans and settling with Bayles, had actual notice of the lien or claim of Commodity Credit Corporation or that Commodity Credit Corporation, in fact, had a perfected security interest arising from either a duly recorded mortgage or a filed financing statement so as to impart constructive notice to Bunge.

For reasons that follow, we conclude that Bayles was the agent of Bunge having actual authority, which was certainly implied if not express, to buy grain for it, and Bunge is therefore liable for plaintiff's loss. Because we rest our holding upon a finding of actual authority, we do not reach the alternative issue of ostensible authority.

■ Before considering the merits of the case, however, the court is required to rule upon admissibility of evidence offered by plaintiff to the effect that Bayles on various occasions had made extrajudicial statements that he was buying grain for Bunge. This testimony was objected to by defendant, and ruling reserved. Concluding that the objection is well-taken, the court excludes this testimony in accordance with the long-standing rule in Mississippi that unsworn statements of an alleged agent made out of court[4] and not qualifying as res gestae[5] are inadmissible hearsay to establish either the fact of agency or its scope and extent. And, this exclusionary rule obtains regardless of whether there is present other evidence of agency independent of the declarations of the alleged agent.[6] Mississippi has consistently refused to engraft an exception, recognized by some states, of allowing such extrajudicial statements to show the scope or extent of authority where the fact of agency is proved by other evidence.[7]

■■ Under the foregoing decisions, however, Bayles' sworn testimony on the witness stand is clearly admissible, including his statement, which was not objected to, that when beginning the

A buyer in ordinary course of business (subsection (9) of Section 1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

4. Reichman-Crosby Co. v. Dinwiddie, 117 Miss. 103, 77 So. 906 (1918); Cosmopolitan Ins. Co. v. Capitol Trailer & Body, Inc., 244 Miss. 607, 145 So.2d 450 (1962). Cf. Gallo v. Crocker, 321 F.2d 876 (5 Cir. 1963), applying Mississippi law.

5. Byrd v. Anderson-Tully Co., 6 So.2d 319 (Miss.1942).

6. Columbus & Greenville R. Co. v. Mississippi Clinic, 152 Miss. 869, 120 So. 203 (1929). In this case the trial court had admitted the extrajudicial statement of the alleged agent, and the Supreme Court reversed, saying:

"Neither the agency nor the scope thereof can be proven by the [out-of-court] declaration[s] of the alleged agent * * * It is unnecessary to determine whether there was sufficient other evidence to establish Curry's agency for appellant in view of the fact that the judgment must be reversed."

7. See Ann. 3 A.L.R.2d 598, §§ 3–5, pp. 602–608.

grain business known as Coahoma Grain Elevator he told farmers he was "connected with Bunge."[8] The court may also admit, as res gestae, Bayles' statement to Butler, when quoting price, that he was surrendering "part of his commission". While these statements, standing alone, are quite inconclusive, they should be considered along with other relevant evidence in determining the existence of an agency relationship.

■ The substantive rules of law by which this case is controlled are well known. Agency has been comprehensively defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement, Agency (2d ed) § 14. Thus, the factual elements of an agency relation are threefold: (1) manifestation by the principal, by either his words or his conduct or both, that the agent shall act for him, (2) the agent's acceptance of the undertaking, and, most critically, (3) the understanding of the parties that the principal is to be in control of the undertaking. Ibid, § 1, p. 8.

Actual authority is "the power of the agent to effect the legal relations of the principal by acts done in accordance with the principal's manifestations *of consent to him.*" Ibid, § 7, p. 28.[9] Actual authority may be either express or implied. "An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties." 3 Am.Jur.2d Agency § 18, at 429.

■ By contrast, an independent contractor is one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the product or result of his work.[10] Moreover, the test of what constitutes independent services lies in the control exercised, the decisive question being who has the right to direct what shall be done and when and how it shall be done.[11]

■ It is important to note that, although a dual relation may conceivably exist between two persons whereby one is an independent contractor as to certain work, and a mere servant as to other work for the same employer, this is ordinarily not true, particularly where the entire subject matter is embraced in a single agreement.[12] In *Carroll*, the Court was confronted with such a dual relationship where the same person was hired by a lumber company both as woods superintendent and as independent contractor for cutting and hauling logs to its mill. In ruling that agency existed, the Court held:

"Where there exists a dual relationship of employee and contractor, and the authority and duties of the employee embrace the same subject matter as the contract, the court will not attempt a theoretical determination of whose control is being exercised in the performance of the contract. *The right of control of the employer and independency of the contractor cannot coexist.*" (Emphasis added)

---

8. Cosmopolitan Ins. Co. v. Capitol Trailer & Body, Inc., supra.:
   "A witness can testify from the witness stand about his agency just as any other witness."

9. Apparent authority results from the principal's manifestations *to a third person or persons* that another is his agent. Restatement, Agency § 8, p. 30.

10. 41 Am.Jur.2d, Independent Contractors, § 1, p. 737.

11. Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408 (1951); 41 Am.Jur.2d, § 5, p. 744.

12. Carroll v. E. G. Laughlin & Sons, 220 Miss. 535, 71 So.2d 461 (1954); Employers Ins. Co. of Alabama v. Dean, 227 Miss. 501, 86 So.2d 307 (1956). Cf. Corban v. Skelly Oil Co., 256 F.2d 775 (5 Cir. 1958). See 41 Am.Jur.2d, § 2, p. 739.

In the landmark case of Kisner v. Jackson, 159 Miss. 424, 132 So. 90 (1931), often cited with approval in subsequent decisions,[13] the state Supreme Court adopted certain tests to determine in a given case whether "the alleged independent contractor is in fact independent, free of the will of his employer—actually and substantially free from his control." [14]

We disagree with Bunge's assertion that the *Kisner* rule employing the "controls" test is limited to tort cases and should not apply to controversies concerning contractual or non-tort liability. It is true that liability in non-tort cases is predicated on the theory of the legal identity of principal and agent as expressed in the maxim "qui facit per alium facit per se", that is, that the authorized acts of an agent are, in legal contemplation, the same as the principal's acts; and that a principal's tort liability is based, not on an agency relation, but on the relationship of master and servant and is expressed by the maxim "respondeat superior". Both rules and maxims, however, "are founded upon the principle that a duty rests upon every man, in the management of his own affairs, whether by himself or by his agents or servants, so to conduct them as not to injure another, and that if he does not do so, and another is hereby injured, he shall answer for the damage. This principle does not work any injustice to the principal, for it is based upon the policy of protection of the third person and results from the consideration that it is the principal who makes it possible for the agent to inflict the injury." 3 Am.Jur.2d Agency, § 261, p. 627. More simply stated, where a loss is to be suffered through the misconduct of an agent, it should be borne by those who put it in his power to do the wrong, rather than by a stranger.

Ordinarily, and as is true in this case, whether an agency has been created is a question of fact; and it may be established the same as any other fact, either by direct or by circumstantial evidence. Of course, the burden is upon the plaintiff to prove agency, and once the relation has been shown to exist, it will be an agency whether the parties understood the exact nature of the relation or not, and irrespective of how the parties may have either designated themselves or their relationship.[15]

The written instrument between Bunge and Bayles (Fn. 1), if viewed abstractly, might be seen as an attempt to create in one document three different relations: (1) the relationship of vendor

13. ·Gulf Refining Co. v. Nations, 167 Miss. 315, 145 So. 327 (1933) ; Texas Co. v. Mills, 171 Miss. 231, 156 So. 866 (1934); Sones v. Southern Lumber Co., 215 Miss. 148, 60 So.2d 582 (1952) ; Mississippi Employment Security Com. v. Plumbing Wholesale Co., 219 Miss. 724, 69 So.2d 814 (1954) ; Employers Ins. Co. of Alabama v. Dean, supra.

14. Kisner v. Jackson, 132 So. at 91:
"There are several tests to be applied, the weight of each, and whether much or little, rising and falling in the scale as it may or may not be counterbalanced by one or more of the remaining tests, present in the particular case in hand. For this reason these tests cannot be stated in any precise order of importance, but they are as follows: Whether the principal master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the sub-employees and to fix their compensation; and whether he is obliged to pay the wages of said employees. These are the tests, as we think, and any other, if differently stated, may be brought within one of those above briefly set out."

15. 3 Am.Jur.2d, §. 21, p. 430.

(Bayles) and purchaser (Bunge) for buying grain; (2) the relationship of landlord (Bunge) and tenant (Bayles) for use of the Roundaway elevator; and (3) the relationship of principal (Bunge) and agent (Bayles) only for soliciting grain storage. It would be utterly unrealistic, however, to thus segment their relationship. The evidence overwhelmingly indicates that Bunge's dominant, if not sole, motive for making the agreement was to promote its grain-buying program, particularly by enhancing the use of its Hurricane Point facility through the aid and assistance of satellite elevators like those it built at Roundaway and Lula.

Bunge's objective in building the Roundaway elevator, as proclaimed in the agreement, was to enable the "operator [Bayles] to receive grain * * * for shipment to owner [Bunge]", which the parties clearly understood to be by truck delivery to nearby Hurricane Point. In accomplishment of that purpose, Bunge agreed to purchase from Bayles "for immediate delivery to [it] *all grain received by the elevator*", and "at prices agreed upon [between it and Bayles] at intervals during the day." Significantly, the agreement did not contemplate that Bunge and Bayles might not agree on prices; no provision covered that eventuality, nor was Bayles in any case released to sell to others. And while Bayles did not expressly bind himself to sell or deliver grain to Bunge in any quantity, his obligation to deal with Bunge is necessarily implied from the agreement which he signed as "Mgr.", if the other terms of their understanding are to have a reasonable meaning. We therefore, hold not only that the agreement bound Bunge to purchase and Bayles to deliver all grain handled at the Coahoma Grain Elevator but also the agreement was so interpreted by Bunge and Bayles throughout the course of their dealings.

Basic ambiguities and omissions, however, remain in the contract as written.

For example, the prices to be paid Bayles for grain are those "agreed upon at intervals during the day", suggesting that the parties would negotiate for prices before transactions took place. As shown by the extrinsic evidence, however, the parties never intended to negotiate for prices and the only agreement they contemplated was Bayles' acceptance of prices quoted to him by Bunge, which acted on the basis of information obtained by it from the Chicago Board of Trade. If Bayles did not accept the price offered by Bunge, he was neither free to sell to other buyers grain on hand nor able to purchase additional grain from farmers. By this common understanding of the agreement, Bunge and Bayles intended for the price to be thus fixed; Bayles had merely the privilege, after consulting Bunge, of decreasing the price paid to farmers to allow for his compensation and operating costs.

The agreement omits any reference to the manner of determining, as between Bunge and Bayles, the weights and grades of grain handled under the contract, notwithstanding that these two factors greatly influence the value of a given quantity of grain. The extrinsic evidence shows that the parties always intended to be controlled by, and invariably adopted Bunge's weights and grades at Hurricane Point, and they ignored the availability of weighing and grading services at the Coahoma Grain Elevator. It is plain that Bayles was obliged to deal on Bunge's weights and grades in delivering all grain, without benefit of arbitration privileges or independent determination.

As so construed by the court, in light of the practically undisputed evidence, the operator's agreement gave to Bunge absolute control over all grain received by Bayles at the Coahoma Grain Elevator, for purchase by Bunge at a price fixed by it, and at weights and grades determined by it. Contrary to Bunge's assertions, these contract provisions are a far cry from giving Bunge a right of

first refusal to buy only if its price was competitive.[16] As heretofore found, the occasional sales Bayles made to other parties was by express permission granted by Blundell who would give consent where special circumstances existed. We note that Bayles' testimony in this regard was not contradicted by Blundell, who was not called as a defense witness.

Because of the controls held by Bunge, Bayles' grain buying operations, at both Coahoma and Lula Grain Elevators, contributed to, and became a substantial and integral part of the business transacted at the Hurricane Point facility, thus achieving Bunge's business purpose for entering into the operator agreements with Bayles. Bayles was at all times a controlled and not an independent operator. His status as a controlled operator remained unchanged even though Bunge, which was not required by its contract so to do but in obvious appreciation of the business, elected to extend to him the same privileges that it granted to independently owned and operated small elevator customers like Shelby Grain Elevator, such as permitting him to store grain in large quantities in his own name, entering into purchase contracts for future delivery, and making numerous advances against grain in storage or on contract. Without doubt, these arrangements in themselves enabled Bayles' tradings to expand even more, and were to the business advantage of Bunge so long as its agent was faithful in his transactions, but we hold that they are without significance to insulate Bunge from liability for the consequences resulting from the agent's delinquency.

Having concluded that agency existed between Bunge and Bayles for buying grain and that it was dominant in their contractual relations, the court would be justified in declining to consider the effect of other provisions of the agreement which attempt to negate or curtail agency.[17] As the Supreme Court of Mississippi said in an analogous case, "By the terms of the contract it appears that appellant tried to make Wilkins an independent contractor and at the same time retain complete control of the business. This cannot be done under the law." [18]

It is evident, however, that the provisions of the operator's agreement suggesting a landlord-tenant relationship for the grain elevator at Roundaway have no force or meaning apart from the agency, but are entirely dependent upon it. The monthly charges which Bayles agreed to pay, if considered rent, resulted only if he traded with Bunge in grain. In the absence of trading, as during April-August 1969, the last months of the contract's term, no charges whatever against Bayles accrued. The amount of "rent" was determined not by actual usage of the "leased" facility at Roundaway but by grain purchases; and in this connection deliveries at Hurricane Point were controlling. Also, it was funds supplied by Bunge in its grain purchases that enabled Bayles to pay the rent as well as his own employees' salaries and other operating costs, including insurance required by the agreement. Since the continuance of the grain-buying agency was at all times necessarily dependent upon transactions between Bayles and Bunge, the term of one year

---

16. Acknowledging that the Bayles contract was "ambiguous", Bunge's management subsequently adopted a completely different agreement with Brunt, Bayles' successor at the Lula Grain Elevator, containing the following paragraph:

"Lessee hereby agrees that the leased property is to be used exclusively for the purpose of conducting a grain elevator business, including purchase, storage, and sale of soybeans and other grain and customary activities of grain elevators, and agrees to offer for sale to Lessor, itself engaged in the business of purchasing, storing, and selling soybeans and other grains, all such commodities acquired by said elevator business at a net price equal to that available to Lessee through other market outlets for the grade and quantity offered."

17. Carroll v. E. G. Laughlin & Sons, supra; Employers Ins. Co. of Alabama v. Dean, supra.

18. Gulf Refining Co. v. Nations, 145 So. at 333.

specified by the agreement may be regarded as a mere formality.

As for the contract provision contemplating availability of storage to farmers at a Bunge river elevator, this was simply an auxiliary service to the grain-buying agency which afforded farmers an opportunity to store and hold their crops for a better price, but under conditions strongly favoring Bunge as ultimate buyer. We find nothing inconsistent with agency when Bayles, rather than farmers, paid Bunge its regular storage charges on grain which it allowed him to store in his own name. Thus, the agency relation present in this case is not defeated by the various other clauses in the agreement, even if they were of a conflicting nature.

Despite a multitude of decisions on the subject of servant and independent contractor, we have not found, on our own research or in excellent briefs of counsel, a case in Mississippi or elsewhere that is factually in point. In the absence of factual precedent to guide our determination, we look to five Mississippi holdings which, when considered together, illustrate the determinative nature of the tests of control enunciated in Kisner v. Jackson. This conclusion is consistently reached, irrespective of the factual situation in a particular case. Only brief review will be made of these cases which figure prominently in the state's jurisprudence.

In *Kisner*, the owner of a sawmill and equipment leased its property to Johnson for the manufacture of logs and blocks in sizes desired by the lessor and for their delivery to a railroad for shipment to the lessor "at such price as may be agreed upon." The lessor agreed to furnish Johnson money for his payroll and deduct advances from the amounts due for the delivered product. The contract further provided that the owner would not be liable for the wages of employees engaged by lessee in the operation of the business nor responsible for any resulting accidents. In a negligence suit against the sawmill owner by Johnson's employee who was injured in the course of employment, the court held that Johnson was not an independent contractor and plaintiff was an employee of the mill owner.

In Gulf Refining Company v. Nations, supra, Wilkins was placed in charge of Gulf Refining Company's local storage plant under a contract whereby Gulf furnished everything in the business, except trucks and tanks which Wilkins was to furnish and also except employees hired by Wilkins. The contract specified that Wilkins was to have entire management and operation of the business and Gulf would not be responsible for his negligence, or that of his employees, in conducting the business. Plaintiff sued Gulf for damages for assault and battery committed by Bentz, an employee of Wilkins. The Supreme Court rejected the defense that Wilkins was an independent contractor, and affirmed liability against Gulf. In words pertinent to Bayles' status here, the Court declared:

"In the conduct of the business, what independence did Wilkins have? By the plain terms of the contract, as well as under the construction put upon it by the parties, the appellant was to furnish and control everything in the business, except the trucks and tanks, and the necessary help for the sale and delivery of the products, which Wilkins was to furnish. He deemed the commission he was receiving from appellant sufficient for that purpose, and to reasonably compensate him for his time and services. It is true that he fixed the compensation of his helpers, and paid them for their services; but he paid them, of course, out of the commissions he received from appellant. Appellant, however, had equally as large a power over Wilkins' helpers as had Wilkins, for under the contract appellant had a right to cancel it for any cause it deemed sufficient. That right, of course, necessarily carried with it, if exercised, the discharge of Wilkins and all of his employees." 145 So. at 332.

In Mississippi Employment Security Commission v. Plumbing Wholesale Co., supra, a plumbing company every two weeks received carload shipments of pipe and other plumbing material delivered to its yard by the carrier. Having no regular employees available for unloading, the company contracted with Teague to perform the work for $20 per car. Teague selected and paid his helper, had no regular hours of work and, being familiar with the job, was unsupervised during the unloading. Teague furnished no special tools and did the work on the company's premises. The plumbing company, having been assessed with state unemployment taxes for Teague, brought refund suit claiming that he was not its employee but an independent contractor. The court acknowledged that Teague, who was familiar with the business, received no direct supervision from the plumbing company. Nevertheless, it emphasized that Teague "was subject to the control of the plumbing company at all times while he was engaged in unloading the cars and stacking the plumbing materials in the warehouse and on the yard." 69 So.2d at 818. Similarly, in the present case, it is Bunge's right of control over Bayles that is to be looked at, and not the extent to which he might have been directly supervised in the daily operations of the Coahoma Grain Elevator.

In Brown v. L. A. Penn & Son, 227 So. 2d 470 (Miss.1969), a workmen's compensation claim arose against Penn,[19] who was a dealer in pulpwood. Penn contracted with Brown for the latter to cut and haul wood to Penn's customers. At least 80% of the cutting and hauling was done off of tracts of land for which Penn had made arrangements. In other cases Brown bought stumpage from owners which he sold to Penn. Brown was paid weekly on a unit or cord basis, from which payments Penn deducted advances previously made to Brown. The evidence indicated that these financial arrangements, which were longstanding and extensive, required Brown more or less to deliver all of his loads to Penn, and this required practically all of Brown's time. Rejecting the claim that Brown was an independent contractor, the Court declared:

"The right of control rather than the actual exercise of control is a primary test of whether a person is an independent contractor or employee. In the instant case there is direct evidence of the right to control, the express or implied exercise of that right, the method of payment, the furnishing of equipment by financing its purchase, and the right to fire. In short, Brown was not truly independent, performing an independent business service, but devoted all or most of his time to Penn. Moreover, his work for Penn was an integral part of Penn's business process. Brown's work and that of other haulers who operated similarly to him had become enmeshed with and were an integral part of their employer's business." 227 So.2d 474.

The question of contract terminability arose in Brown v. E. L. Bruce Co., 253 Miss. 1, 175 So.2d 151 (1965), also a workmen's compensation case. There E. L. Bruce Company, as employer, entered into written hauling contracts with Kirby, a hauler. Kirby performed hauling contracts with Bruce for 12 years, and during that time signed more than 50 written contracts with E. L. Bruce Company, all of similar effect but none having a stated term of duration. The evidence showed that despite the many contracts, it was understood between the parties that Kirby could quit working for E. L. Bruce Company at any time and Bruce had the right to fire him at any

19. Boyd v. Crosby Lumber & Mfg. Co., 250 Miss. 433, 166 So.2d 106 at 108, (1964) suggests that the control test might be "even more liberal in compensation cases" than the common law rule in negligence cases dealing with vicarious liability. But

cf. Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408 (1951), which held the test in workmen's compensation cases is determined by common law principles of agency.

time. The Court, in finding E. L. Bruce Company liable to Kirby's employee injured in the course of employment, ruled against the contention that Kirby was an independent contractor. The Court based its finding that the contract was terminable at will upon the real understanding of the parties, and not what appeared in their written agreements. Although the case is not precisely in point to the issue of contract terminability raised in this case, it is clear that the duration of the relationship between Bunge and Bayles was governed by their continuance of grain buying which was subject to the control and will of Bunge, and this is to prevail over the written agreement indicating a year-to-year term.

Bunge relies strongly upon Hercules Powder Co. v. Westmoreland, 249 Miss. 849, 164 So.2d 471 (1964), but it, in our opinion, is easily distinguishable on its facts. Hays, the truck owner, agreed to purchase from Peacock pine stumps located on the latter's farm. Hays in turn had an arrangement with Hercules Powder Company to sell it stumps cut to specifications and delivered to the premises of Hercules Powder Company 7 miles distant from the Peacock farm. Hays was paid so much per ton for the stumps and a mileage allowance for the hauling. On the evidence before it, the state supreme court ruled that Hercules Powder Company was not liable for Hays' negligence in driving his truck from his home to the Peacock land to begin the day's work of removing stumps. Recognizing *Kisner's* continuing vitality, the Court concluded that Hays was an independent contractor because he was not under its domination or control. Substantial evidence in the case at bar clearly leads to the conclusion that Bunge held the dominant control in Bayles' grain-buying activities.

Using the applicable standard required by the Mississippi decisions, we, as the trier of fact, conclude that the evidence in the case at bar reveals the following indicia of agency: (1) Bunge furnished all or practically all of the means and appliances for the work; (2) Bunge furnished substantially all funds received by Bayles; (3) Bunge controlled the destination of all grain handled by Bayles; (4) Bunge controlled the price, weights and grades of all grain handled by Bayles; (5) Bunge, on certain occasions, permitted Bayles to sell a limited quantity of grain to other buyers; (6) Bunge not only had the right to direct details important to grain buying but gave actual direction to Bayles through constant contact, quoting its price to him and consulting with him regarding prices for the farmers; (7) Bunge had a significant degree of control over the operation of the grain elevator at Roundaway in such areas as training Bayles' personnel, inspecting the premises and requiring maintenance of insurance against hazards of operation; (8) Bayles' grain transaction with farmers was the identical type of business activity that was regularly carried on by Bunge, and Bayles' transactions formed a substantial part of Bunge's business that was developed from the area in which Coahoma Grain Elevator operated; and finally (9) although the agreement formally specified a fixed term, the relationship between the parties had no viability apart from grain dealings that were wholly subject to Bunge's will. These findings make clear that Bunge did not consider Bayles an independent operator who was free to become Bunge's competitor in buying grain from the farmers in the region, but rather that he was effectually given authority to buy grain for Bunge.

Finally, defense counsel contend that when Bayles proposed to Butler that he send two-thirds of his bean crop having high moisture content to the Coahoma Grain Elevator for blending with dry beans, Bayles was acting against Bunge's interest, and Butler should have inquired of Bunge as to Bayles' authority for such an arrangement. While an agent must act for and not adversely to the interest of his principal, and another dealing with an agent who is known to act detrimentally to his principal's in-

terest is bound to make proper inquiry or proceed at his own risk,[20] defendant offered no evidence in support of its assertion. There *is no proof as to the* actual moisture content of Butler's beans, or if such content exceeded the tolerance permitted by grain elevators, or that the mixing of the beans at the Coahoma Grain Elevator was, in fact, detrimental to Bunge. Further, the evidence does not show that Bayles failed to dock Butler for beans with moisture content exceeding allowed tolerances, or that Bayles' money settlement with Butler was incorrectly calculated. In a word, Bunge failed to present any evidence to support the claim that Bayles acted adversely to Bunge's interest in the methods he employed in dealing with Butler's soybeans.

For the foregoing reasons we hold that plaintiff is entitled to recover the full value of the soybeans in controversy, together with legal interest thereon from March 1, 1969, and that Bunge, on its third party complaint is entitled to judgment against Bayles for said amount.

---

20. Consumers Credit Corp. v. Swilley, 243 Miss. 838, 138 So.2d 885 (1962); Wild- berger v. Hartford Fire Ins. Co., 72 Miss. 338, 17 So. 282 (1895).